UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :

UNITED STATES OF AMERICA

                                    :

        - v. -

                                    :    22 Cr. 397 (RMB)

STEPHEN BUYER,

                                    :

                Defendant.

                                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTIONS *IN LIMINE*

 

                                                       DAMIAN WILLIAMS
                                                       United States Attorney
                                                       Southern District of New York

Jordan Estes
Kiersten A. Fletcher
Margaret Graham
Assistant United States Attorneys
     *- Of Counsel -*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ...................................................................................................................... 1

    I.     Evidence of the Sprint Scheme Is Admissible to Prove the Navigant Scheme, and Vice
Versa..................................................................................................................................1

        A.     The Evidence of the Insider Trading Schemes ........................................................... 2

        B.     The Two Insider Trading Schemes Are Inextricably Intertwined ............................... 6

        C.     Alternatively, Evidence of Each Scheme Is Admissible Under Rule 404(b) to Prove
the Defendant's Motive, Intent, Plan, Knowledge, and Lack of Mistake............................... 9

    II.    The Defendant's Extramarital Affair is Direct Evidence of the Charged Schemes and,
Alternatively, Admissible Under Rule 404(b) ........................................................................ 12

        A.     Applicable Law........................................................................................................ 12

        B.     Discussion.......................................................................................................... 13\

    III.    Executive-1's Anticipated Testimony Regarding T-Mobile/Sprint Merger Talks Is
Admissible ............................................................................................................................ 14

        A.     Factual Background................................................................................................. 14

        B.     Applicable Law....................................................................................................... 15

        C.     Discussion.............................................................................................................. 16

    IV.    Salesperson-1's Statements Are Admissible as Non-Hearsay to Show their Effect on the
Listener and to Provide Context for Later Events ................................................................... 18

        A.     Factual Background................................................................................................. 19

        B.     Applicable Law....................................................................................................... 19

        C.     Discussion.............................................................................................................. 20

CONCLUSION.................................................................................................................... 21

## **<u>TABLE OF AUTHORITIES</u>**

**Cases**

*Brown v. Keane,*
    355 F.3d 82 (2d Cir. 2004)........................................................................................... 16

*Folio Impressions, Inc. v. Byer California,*
    937 F.2d 759 (2d Cir. 1991)......................................................................................... 16

*Huddleston v. United States,*
    485 U.S. 681 (1988)...................................................................................................... 10

*S.E.C. v. DiBella,*
    587 F.3d 553 (2d Cir. 2009)......................................................................................... 11

*United States v. Blake,*
    195 F. Supp. 3d 605 (S.D.N.Y. 2016)......................................................................... 11

*United States v. Brockenborrugh,*
    575 F.3d 726 (D.C. Cir. 2009)..................................................................................... 12

*United States v. Carboni,*
    204 F.3d 39 (2d Cir. 2000)............................................................................................. 7

*United States v. Cardascia,*
    951 F.2d 474 (2d Cir. 1991)................................................................................... 18, 20

*United States v. Certified Env't Servs., Inc.,*
    753 F.3d 72 (2d Cir. 2014)........................................................................................... 20

*United States v. Curley,*
    639 F.3d 50 (2d Cir. 2011)........................................................................................... 10

*United States v. Cuti,*
    720 F.3d 453 (2d Cir. 2013)......................................................................................... 15

*United States v. Daly,*
    842 F.2d 1380 (2d Cir. 1988)................................................................................... 7, 13

*United States v. Dupree,*
    706 F.3d 131 (2d Cir. 2013)......................................................................................... 20

*United States v. Garcia,*
 291 F.3d 127 (2d Cir. 2002)............................................................................ 17

*United States v. Garcia,*
 413 F.3d 201 (2d Cir. 2005)............................................................................ 17

*United States v. Gonzalez,*
 110 F.3d 936 (2d Cir. 1997)......................................................................... 6, 7

*United States v. Greer,*
 631 F.3d 608 (2d Cir. 2011)............................................................................. 7

*United States v. Hsu,*
 669 F.3d 112 (2d Cir. 2012)............................................................................. 7

*United States v. Kaiser,*
 609 F.3d 556 (2d Cir. 2010)......................................................................... 6, 7

*United States v. Kohan,*
 806 F.2d 18 (2d Cir. 1986)............................................................................. 20

*United States v. Mermelstein,*
 487 F. Supp. 2d 242 (E.D.N.Y. 2007) ...................................................... 12, 13

*United States v. Moses,*
 19 Cr. 6074, 2021 WL 4558137 (W.D.N.Y. Oct. 6, 2021) .............................. 12, 13

*United States v. Nosal,*
 2013 WL 11327121, 8 Cr. 237 (N.D. Cal. Mar. 29, 2013)...................................... 12

*United States v. Pedroza,*
 750 F.2d 187 (2d Cir. 1984)........................................................................... 20

*United States v. Puzzo,*
 928 F.2d 1356 (2d Cir. 1991).......................................................................... 20

*United States v. Quinones,*
 511 F.3d 289 (2d Cir. 2007)........................................................................... 18

*United States v. Rahim,*
 339 F. App'x 19 (2d Cir. 2009) ...................................................................... 11

*United States v. Rea,*
 958 F.2d 1206 (2d Cir. 1992).......................................................................... 17

iv

*United States v. Rigas*,
   490 F.3d 208 (2d Cir. 2007) ............................................................................ 7

*United States v. Robinson*,
   702 F.3d 22 (2d Cir. 2012) .............................................................................. 7

*United States v. Shyne*,
   388 F. App'x 65 (2d Cir. 2010) ............................................................... 12, 13

*United States v. Siddiqui*,
   699 F.3d 690 (2d Cir. 2012) .......................................................................... 10

*United States v. Zackson*,
   12 F.3d 1178 (2d Cir. 1993) .......................................................................... 11

## Rules

Federal Rule of Evidence 404(b) ........................................................... 6, 7, 9

Federal Rule of Evidence 602 ............................................................... 15, 16

Federal Rule of Evidence 701 ............................................................... 16, 17

Federal Rule of Evidence 801(c) ........................................................... 18, 20

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum in opposition to defendant Stephen Buyer's motions *in limine* to preclude (1) use of the Sprint evidence to prove the Navigant counts and vice versa; (2) evidence of the defendant's extramarital affair; (3) certain testimony by a T-Mobile executive ("Executive-1"); and (4) testimony regarding out of court statements made by the defendant's contact at Guidehouse. For the reasons set forth below, the defendant's motions should be denied.[1]

**ARGUMENT**

**I.    Evidence of the Sprint Scheme Is Admissible to Prove the Navigant Scheme, and Vice Versa**

The defendant's argument that evidence of one insider trading scheme cannot be used as evidence of the other should be rejected. (Buyer Mot. 3.) The Sprint and Navigant insider trading schemes are inextricably intertwined for a number of reasons: (1) they are part of a calculated pattern, or common scheme, to trade on inside information learned during the course of the defendant's consulting work; (2) the defendant's trading in both stocks is highly unusual compared to the other stock trading in the defendant's accounts; and (3) the only trades the defendant conducted in the account of his former paramour ("Individual-1") were the trades in Sprint and Navigant, showing his confidence in the profitability of the trades and motive to violate the law.

---

[1] The defendant also moves to preclude cross-examination regarding certain ethics allegations made against him while he was in Congress. Because the Government does not presently intend to cross-examine the defendant regarding these matters, the defendant's motion should be denied as moot. The Government will notify the Court and defense counsel in advance of any cross-examination should its position on this matter change as the case develops.

1

### A.  The Evidence of the Insider Trading Schemes

At trial, the Government intends to offer evidence that since 2011, the defendant has worked as a consultant for private companies, with a focus on areas in which the defendant gained expertise while in Congress. In the course of that consulting work, in 2018 and 2019, the defendant on at least two occasions misappropriated material non-public information ("MNPI") that he learned as a consultant and used that MNPI to place timely, profitable securities trades in brokerage accounts in his own name and the names of others. On each occasion, one of the accounts in which the defendant traded was held in the name of Individual-1, a woman with whom the defendant previously had a romantic relationship and with whom he remained close friends.

In particular, in or about 2018, the defendant was working as a consultant for T-Mobile. In March 2018, members of T-Mobile's legal department informed certain executives in T-Mobile's Government Affairs group that discussions about a merger of Sprint and T-Mobile, which had previously been abandoned in late 2017, had been renewed. The possibility of a merger was highly confidential, but T-Mobile's Government Affairs executives were authorized to mobilize a small, trusted group of consultants to develop a strategy for securing regulatory approvals and other forms of support for the merger.

The defendant was one of those consultants. He also had a business and social relationship with one of those Government Affairs executives ("Executive-1"). In or about late March 2018, Executive-1 was made aware of the renewed merger discussions between T-Mobile and Sprint. An entry in Executive-1's notes, dated March 27, 2018, indicates that his "To Do" list included "outreach" about the potential merger. Executive-1 had spoken by telephone with the defendant on March 25 and 26, and he spoke with the defendant again by phone on March 28, 2018. From March 28 through 30, 2018, the defendant and Executive-1 took a golf trip together to Miami,

Florida (the "Golf Trip"). They played golf together on March 28, 2018.

On the morning of March 29, 2018, the defendant purchased approximately 42,675 shares of Sprint in three different trading accounts, at a price of approximately $4.84 per share. One of those trading accounts was held in the name of Individual-1 (the "Individual-1 Account"). Another was held jointly with a relative of Buyer's (the "Joint Buyer/Relative-1 Account"), and a third was held in Buyer's name only (the "Buyer Contributory IRA Account"). Before the March 29, 2018 purchases of Sprint, the Individual-1 Account had not been used to purchase or sell any individual securities. The Joint Buyer/Relative-1 Account had been used for only one other stock purchase with a substantially lower cost basis (purchase price). And although the Buyer Contributory IRA Account had been used for numerous stock purchases over the years, Buyer's purchase of Sprint was for tens of thousands of dollars more than any other stock purchase in the account.

On or about April 3, 2018, the defendant purchased an additional 10,000 shares of Sprint in the Buyer Contributory IRA Account, resulting in a total cost basis of $146,307.90 for the Sprint shares in that account. On or about April 5, 2018, the defendant purchased an additional 60,000 shares of Sprint in his separate SEP-IRA Account (the "Buyer SEP-IRA Account"), at a total purchase price of approximately $312,004.95. This purchase was also for tens of thousands of dollars more than any other purchase in the Buyer SEP-IRA Account.

On or about April 29, 2018, Sprint and T-Mobile announced that they had executed a business combination agreement in a deal that would value Sprint stock at $6.62 per share. In or about August 2018, the defendant sold shares in Sprint in all four accounts for a total gain of over $126,000.

The defendant again engaged in insider trading in 2019, when he was working as a consultant for Guidehouse, a consulting business targeting the public sector. On or about June 12,

3

2019, through a conversation with a Guidehouse salesperson ("Salesperson-1"), the defendant became aware of MNPI indicating that Guidehouse was doing due diligence on a merger with a company involved in revenue cycle management in the healthcare consulting space. Within hours of learning this information, the defendant used this MNPI to determine that Guidehouse intended to purchase Navigant.

The next morning, the defendant emailed himself an analyst report from a stock research website ("Website-1") listing Navigant as a strong stock pick. He also emailed the analyst report to his son, with whom he shared a trading account, and wrote that he was "thinking of buying" Navigant stock. The defendant sent these emails in an effort to conceal his intent to trade on MNPI by creating the appearance of an innocent basis for his trading.

Shortly after sending the email to his son, the defendant purchased a total of 28,300 shares of Navigant across three brokerage accounts, including the account he shared with his son, at prices ranging from $22.40 to $22.51 per share. The defendant continued trading in Navigant through on or about August 1, 2019. The trades were placed in six accounts, including an account in his wife's name, the account he shared with his son, and the Individual-1 Account.

Like the trading in Sprint, the trading in Navigant was substantially larger than the other trades in the defendant's accounts. For example:

- In the account the defendant shared with his son (the "Joint Buyer/Son Account"), which was used frequently for trading, the defendant's purchase of Navigant stock on June 13, 2019, at a cost basis of $180,008.96, was tens of thousands of dollars higher than any other stock purchase in the account.

- In the Buyer Contributory IRA Account, by July 2019, the Navigant trades had a larger cost basis – approximately $321,621.48 – than any other trades in that

4

account.

- In the Buyer SEP-IRA Account, the total cost basis for the Navigant trades, of approximately $316,947.91, was larger than the cost basis of any other trading in the account. The only comparable cost basis was the $312,004 for the Sprint trades. All other trades involved a cost basis that was at least $90,000 lower.

- In an IRA account held in his wife's name ("Buyer's Wife Account"), other than an investment in a Schwab money market fund, the only trading in the account through August 2019 was Buyer's purchase of 2,700 shares of Navigant stock, at a cost basis of $65,614.95.

- In an account held jointly with his wife (the "Joint Buyer/Wife Account"), other than an investment in a Schwab money market fund, the first trading in the account is Buyer's purchase of two stocks on August 1, 2019: 5,020 shares of Navigant, at a cost basis of approximately $121,549.99, and his purchase of 600 shares of Twilio, at a cost basis of $82,801.59.[2]

- Between the time the Individual-1 Account was opened in or about 2017, and the time of the 2019 Navigant trades in that account, the only other securities purchased or sold in the account were the Sprint shares traded in 2018.

On August 2, 2019, Navigant and Guidehouse announced the acquisition in a joint press release. That day, Navigant's stock price closed at $28.06, an approximate increase of 17% over its closing price the day before.

---

[2] After selling his Navigant stock for a profit, Buyer later bought 700 additional shares of Twilio, resulting in a total cost basis of $170,662.28 for his Twilio shares.

After the merger announcement, the Financial Industry Regulatory Authority ("FINRA") opened an inquiry into pre-announcement trading in Navigant. Acting on a request for information from FINRA, on October 31, 2019, Guidehouse counsel interviewed the defendant by phone. During the interview, the defendant admitted having traded in Navigant stock in his own accounts but made no mention of his trading in the Individual-1 Account. The defendant also asserted that he did not have any inside information about the transaction, nor was he privy to any conversations with Guidehouse regarding a potential transaction.

On November 2, 2019, just two days after the interview, Buyer sent the following message to Salesperson-1, via the encrypted messaging application Signal: "I need to see you. Please . . . I will catch next flight. I was interviewed and told them I bought and figured it was either Huron or Navigant on my own which is true and no one ever told me or uttered the word Navigant which is also true . . . I had seen Zach's research that recommend it around June 8 as a buy and had sent an Email to my son about it . . . he never replied."

## B.  The Two Insider Trading Schemes Are Inextricably Intertwined

Evidence of an uncharged act is admissible as direct evidence, without regard to Rule 404(b), if the uncharged act (1) "arose out of the same transaction or series of transactions as the charged offense"; (2) "is inextricably intertwined with the evidence regarding the charged offense"; or (3) "is necessary to complete the story of the crime on trial." *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997); *see also United States v. Kaiser*, 609 F.3d 556, 570 (2d Cir. 2010) (explaining that some kinds of evidence offered "to show the background of a conspiracy" is not "other crimes" evidence subject to Rule 404(b), but rather "'direct proof of the charged conspiracy'"). Such "background evidence" may be admitted "to provide background for the events alleged in the indictment" and to show "the circumstances surrounding the events or to

6

furnish an explanation of the understanding or intent with which certain acts were performed." *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988).

The Second Circuit has repeatedly affirmed the admissibility of evidence fitting one or more of *Gonzalez*'s descriptions, whether it relates to conduct during the period of the charged crime or before it. *See, e.g.*, *United States v. Hsu*, 669 F.3d 112, 118-19 (2d Cir. 2012) (following conviction after trial on campaign finance related charges, affirming district court's admission, as direct evidence, of testimony that defendant had engaged in a Ponzi scheme contemporaneously with, and arguably related to, the campaign finance violations); *United States v. Robinson*, 702 F.3d 22, 37-38 (2d Cir. 2012) (in child sex trafficking case, affirming admission as direct evidence necessary to complete the story of the crimes on trial proof of defendant's calls, contemporaneous with the charged conduct, in which he discussed uncharged crimes related to prostitution and trafficking); *United States v. Greer*, 631 F.3d 608, 614 (2d Cir. 2011) (where defendant was charged with being a felon in possession of a firearm, affirming admissibility as direct evidence necessary to complete the story of the crime charged testimony regarding defendant's uncharged plan to commit a robbery, which immediately preceded the charged conduct); *Kaiser*, 609 F.3d at 571 (in securities fraud case, holding that bad acts predating the conspiracy were admissible as direct evidence, without regard to Rule 404(b), because they had carry-over effects during the conspiracy); *United States v. Rigas*, 490 F.3d 208, 238-39 (2d Cir. 2007) (affirming district court's decision to permit Government to adduce evidence of uncharged fraudulent acts predating the charged conspiracy as direct proof of charged accounting fraud conspiracy because the evidence was "'inextricably intertwined with'" the proof of the charged conspiracy and "'necessary to complete the story of the crime on trial'"); *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (in case charging false statements to maintain a line of credit, affirming admissibility of uncharged

7

acts of falsification of business inventory, which occurred at or around the same time as the charged crimes, as direct proof inextricably intertwined with charged conduct).

Here, the evidence of the Navigant insider trading scheme is inextricably intertwined with, and necessary to complete the story of the Sprint insider trading scheme for at least three reasons.

*First*, the anomalous nature of these trades as compared to the defendant's other, uncharged trades is evidence of his possession and use of material non-public information as part of a unified scheme to illegally profit from his consulting relationships.[3] For example, the fact that the defendant traded in Individual-1's account on both of these occasions – and only on these occasions – is probative of the fact that he was trading on the basis of MNPI that essentially guaranteed that he would be gifting her substantial sums. The same is true of the fact that, in each instance, the defendant took positions in both his own accounts and others' accounts that were substantially larger than the positions that he was accustomed to taking. The Government should be permitted to argue that the defendant's Sprint and Navigant trades were anomalous and prompted by the fact that in each instance he possessed MNPI that essentially guaranteed him and his associates substantial personal profit.[4] If the Government is not permitted to point out for the jury the ways in which the two sets of trades are similar to each other and also utterly different

---

[3] The defendant argues that the Government cannot use this evidence to show a common scheme or plan because the Government's 404(b) notice used the phrase "calculated pattern," rather than "common scheme or plan," to describe one of the Rule 404(b) purposes. (Buyer Mot. 5.) This semantic argument ignores, however, that the Government's opposition to the defendant's pre-trial motions expressly stated that evidence of each scheme "will show that his conduct was part of a common scheme: to use inside information learned through his consulting work to turn an illicit profit, using multiple of the same brokerage accounts, including that of Individual-1." (ECF 39 at 4-5.) Accordingly, the defendant has been on notice since November 16, 2022 that the Government will use the evidence for this purpose.

[4] Separately, as explained below, the romantic nature of the defendant's relationship with Individual-1 provides evidence of his motive to violate the law on both occasions.

from the defendant's securities trades more generally, the jury may be left with the misimpression that his manner of trading on the occasions in which the Government argues he possessed MNPI was no different from his manner of trading on other, uncharged occasions.

*Second*, the defendant's effort to use the Zacks report to provide a false cover story for his trading in Navigant is probative of his knowledge that insider trading is wrong and illegal, an element that the Government must prove with respect to both the Sprint and Navigant episodes of insider trading.

*Third*, and similarly, the defendant's efforts to contact the Guidehouse employee following the FINRA inquiry and seed an innocent account of what prompted his trading in Navigant are probative both of the defendant's knowledge of the legal prohibition on insider trading and his knowledge and understanding that consulting arrangements of the type that the defendant had with T-Mobile and Guidehouse are characterized by duties of trust and confidence that may give rise to insider trading liability.

### C. Alternatively, Evidence of Each Scheme Is Admissible Under Rule 404(b) to Prove the Defendant's Motive, Intent, Plan, Knowledge, and Lack of Mistake

Alternatively, even if it did not constitute direct evidence, evidence of each insider trading scheme would be admissible under Rule 404(b) with respect to the other insider trading scheme to establish the defendant's motive, intent, plan, knowledge, and absence of mistake.

Rule 404(b), while prohibiting the introduction of other act evidence to prove that the defendant has a propensity to commit the offenses charged, nonetheless explicitly allows admission of such evidence "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). The Second Circuit has adopted an "'inclusionary' approach" to Rule 404(b), under which

"all 'other act' evidence is generally admissible unless it serves the sole purpose of showing a defendant's bad character." *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012); *see also United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) ("'Other act' evidence serves a proper purpose so long as it is not offered to show the defendant's propensity to commit the offense."). To determine admissibility under Rule 404(b) (in conjunction with Rule 403), the Court should consider whether (1) the evidence is offered for a proper purpose; (2) the evidence is relevant to a disputed issue; and (3) the probative value of the evidence is substantially outweighed by its prejudicial effect. *Curley*, 639 F.3d at 56-57. In addition, the Court should give an appropriate limiting instruction to accompany any such evidence, if the defense so requests. *Id.*

The Supreme Court has recognized that "[e]xtrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *Huddleston v. United States*, 485 U.S. 681, 685 (1988). Here, evidence of each set of insider trades is permissible evidence of the defendant's knowledge, intent, and motive with respect to the other.

The Government should be permitted, for example, to argue that the defendant's emotional relationship with Individual-1 motivated him to break the law not once, but twice. Similarly, the fact that the defendant profited handsomely the first time he traded on illicit MNPI is probative of the defendant's motive to break the law a second time.

As discussed, the defendant's obstructive conduct following the Navigant trades is likewise relevant to establish his knowledge of the prohibition on insider trading and of the fact that he owed duties of trust and confidence to Guidehouse and T-Mobile. The defendant argues that the separate schemes cannot be used to establish intent. (Buyer Mot. 5.) But it is well established that

10

"[w]here a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged." *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993).

The court should also reject the defendant's claim that the Government cannot use the evidence to show lack of mistake or accident. (Buyer Mot. 7.) As explained, even if the defense does not argue that the defendant "had not realized that he was in possession of MNPI when he traded," (*Id.*), given the similarity in trading strategies and the anomalous nature of that trading vis-à-vis the defendant's other trades, evidence of each set of insider trades is relevant to show that the defendant was in fact in possession of MNPI on each occasion, a fact that the defense emphatically disputes. In other words, evidence of each set of trades is relevant to showing that, in the case of the other, the defendant did not merely get lucky when he placed well-timed and profitable trades in the stocks of companies that were acquisition targets of companies for which he consulted. Rather, he was in possession of MNPI that made the profitability of those trades a certainty. *See United States v. Rahim*, 339 F. App'x 19, 23 (2d Cir. 2009) (finding no abuse of discretion in admission of evidence regarding similar insider trading scheme involving prior employer because it showed "absence of mistake or accident" under Rule 404(b)); *see also S.E.C. v. DiBella*, 587 F.3d 553, 571 (2d Cir. 2009) (affirming admission of 404(b) evidence of the defendant's prior bad acts, where such evidence went to the defendant's "knowledge or absence of mistake because it demonstrates that [the defendant] knew how to illegally take advantage of his position as Treasurer for personal gain"); *United States v. Blake*, 195 F. Supp. 3d 605, 612 (S.D.N.Y. 2016) (holding that where two similar conspiracies were being tried together, each conspiracy could be considered as to the other "to prove intent, knowledge, or absence of mistake").

11

## II.    The Defendant's Extramarital Affair is Direct Evidence of the Charged Schemes and, Alternatively, Admissible Under Rule 404(b)

The defendant moves to preclude evidence that he engaged in an extramarital affair with Individual-1 before placing illegal stock trades in her account. Because the nature of the defendant's relationship with Individual-1 is direct evidence of the charged schemes, would alternatively be admissible under Rule 404(b), and is not unduly prejudicial, the defendant's motion should be denied.

### A.  Applicable Law

Faced with a motion to exclude evidence about infidelity, several courts in this Circuit and others have reached the conclusion that evidence of intimate relationships that are probative of the charged conduct may be admitted without resulting in undue prejudice. *See, e.g.*, *United States v. Mermelstein*, 487 F. Supp. 2d 242, 262 (E.D.N.Y. 2007) (cooperating witness permitted to testify about her affair with the defendant, in part because the defendant "used the fact of the affair in furtherance of the charged conspiracy"); *United States v. Moses*, 19 Cr. 6074, 2021 WL 4558137, at *2-3 (W.D.N.Y. Oct. 6, 2021) (admitting evidence of defendant's extramarital affair as probative of motive and not unduly prejudicial); *United States v. Nosal*, 8 Cr. 237, 2013 WL 11327121, at *6-8 (N.D. Cal. Mar. 29, 2013) (allowing evidence of defendant's extramarital affair with co-conspirator because it gave insight into their relationship, explained defendant's knowledge of certain facts, and could provide insight into defendant's motivation for certain actions); *see also United States v. Shyne*, 388 F. App'x 65, 71 (2d Cir. 2010) (cross-examination of a character witness about the defendant's sexual infidelity was appropriate); *United States v. Brockenborrugh*, 575 F.3d 726, 736 (D.C. Cir. 2009) (cross-examination about the defendant's extramarital relationship with a co-conspirator was appropriate). Moreover, these courts have typically found that *voir dire* questioning and limiting instructions were sufficient to address any

12

strong feelings jurors might have about infidelity. *See Shyne*, 388 F. App'x at 71; *Moses*, 2021 WL 4558137 at *4; *Mermelstein*, 487 F. Supp. 2d at 262.

### B. Discussion

Here, evidence of the defendant's affair with Individual-1 is highly probative of his motive for placing illegal trades in her account. The Government expects the evidence to show that the defendant and Individual-1 had a decade-long romantic relationship that ended in approximately 2016 when Individual-1 entered into a new relationship. After that, the defendant acted as a financial mentor and friend to Individual-1 in an effort to stay close to her. In doing so, the defendant guided Individual-1 through the process of opening the Individual-1 Account and provided funding before the two trades at issue in the account.

Evidence of the defendant's years-long affair with Individual-1 is direct evidence necessary to explain why the defendant was trading in her account. *See Daly*, 842 F.2d at 1388 ("Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed."). In particular, the fact of the affair, and Individual-1's decision to move on with a new relationship, explain the defendant's efforts to remain close to her by acting as a financial mentor and trading in her account. Even more significantly, the affair, and the defendant's continued efforts to maintain a relationship with Individual-1, demonstrate why the defendant traded in only two stocks in the Individual-1 Account: Navigant and Sprint. In other accounts, the defendant traded frequently in a variety of stocks, and many of those trades lost money. In contrast, in the account of Individual-1, the woman with whom he had an intimate relationship for many years, and to whom he continued to send expressions of love even after the relationship ended, the defendant traded only in the two stocks he was sure would make money. The Government is entitled to offer

13

evidence of the defendant's relationship with Individual-1 to show that this pattern of trading was not an accident, but rather, was an intentional effort to maintain a close relationship with Individual-1 by making profitable trades in her account.

There is no basis to exclude this evidence under Rule 403. Although the Government expects that the jury will hear that the defendant was married, particularly because the defendant also traded in his wife's accounts, the Government does not intend to draw attention to the fact that the relationship occurred while the defendant was married, absent the defendant putting this fact at issue. Additionally, the Government will not object if the defendant requests either a limiting instruction or *voir dire* questions regarding juror views on extramarital affairs. Such steps should be sufficient to guard against any potential prejudice. *See Mermelstein*, 487 F. Supp. 2d at 262 (explaining that jurors who may be affected by evidence of infidelity may be identified during jury selection and challenged for cause).

## III.   Executive-1's Anticipated Testimony Regarding T-Mobile/Sprint Merger Talks Is Admissible

The defendant argues that Executive-1 should not be permitted to testify about whether he told the defendant of the renewed T-Mobile/Sprint merger discussions during the Golf Trip, because Executive-1 does not have sufficient personal knowledge of whether this occurred. This argument misstates Executive-1's expected testimony and is not supported by law. The strength of Executive-1's recollection is a matter for cross-examination, not a reason to preclude his clearly relevant and probative testimony.

### A.  Factual Background

As noted above, Executive-1 and the defendant were together in Florida for three days in March 2018 on the Golf Trip. Executive-1 does not have a memory of a specific conversation with the defendant about the merger during the Golf Trip. But the Government expects Executive-1 will

testify to the following: (i) Executive-1 knew of the renewed merger talks before the Golf Trip, as corroborated by his notes dated March 27, 2018; (ii) the merger discussions were moving quickly; (iii) one of the first items on Executive-1's "to do list" was telling his core group of consultants about the merger, so that they could formulate a strategy; (iv) the defendant was in this core group of consultants; (v) the defendant and Executive-1 were together and having conversations during this Florida trip; and (vi) there was no reason why Executive-1 would <u>not</u> have told the defendant about the merger during the trip.[5]

For all these reasons, Executive-1 believes it is more likely than not that he told the defendant about the merger by the conclusion of the Golf Trip. Further, the Government anticipates that Executive-1 will state that the defendant certainly knew about the merger by April 4, 2018. Separately, trading records show that the defendant bought Sprint stock in a series of transactions between March 29 and April 5, 2018.

### B.  Applicable Law

"The Federal Rules of Evidence allow the admission of fact testimony so long as the witness has personal knowledge, while opinion testimony can be presented by either a lay or expert witness." *United States v. Cuti*, 720 F.3d 453, 457-58 (2d Cir. 2013). Rule 602 requires that a witness have "personal knowledge" of the matter about which they are testifying. Fed. R. Evid. 602. "[P]ersonal knowledge of a fact 'is not an absolute' to Rule 602's foundational requirement, which 'may consist of what the witness thinks he knows from personal perception.'" (quoting Fed. R. Evid. 602 advisory committee's note).

---

[5] The defendant does not appear to challenge the admissibility of this part of Executive-1's testimony.

Rule 701 of the Federal Rules of Evidence provides that a lay "witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, [and] (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed. R. Evid. 701.

### C. Discussion

Executive-1's testimony about the Golf Trip is admissible under Rule 602, because he clearly has "personal knowledge" of the subject. Rule 602 is meant to preclude testimony by witnesses who were not present at the relevant event, such as a witness who did not see a shooting and merely guessed that men of a certain description had committed it, *see Brown v. Keane*, 355 F.3d 82, 90 (2d Cir. 2004), or witnesses who attempt to speculate about another's mental state without any basis. But Executive-1 has personal knowledge of the facts surrounding merger talks at the time of the Golf Trip because he was aware of those discussions and he was on the Golf Trip. Executive-1 should therefore be permitted to testify to facts (i) through (vi) listed above, as well as his belief that, based on these facts, it is more likely than not that his discussion with the defendant about the merger took place on or before the Golf Trip. The defendant's criticism of Executive-1's lack of precision around the timing of this discussion is classic grounds for cross-examination, not a reason to preclude Executive-1's relevant and probative testimony. *See also Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 764 (2d Cir. 1991) ("The fact that Ms. Bruckert stated she 'believed' the document was one in her studio's possession rather than that she 'knew' so is not a basis for excluding her testimony, so long as she testified, as here, from general observation and knowledge, and not upon conjecture or hearsay.").

The defendant further claims that Executive-1's testimony must be characterized as "lay opinion" testimony under Rule 701 and should be excluded because it does not satisfy Rule 701's

16

requirements. This argument fails for two reasons. First, this is not lay opinion testimony because Executive-1 is not offering an opinion, but simply stating the degree of certainty he has about when a topic was discussed. Executive-1 believes that his discussion of the merger with the defendant "more likely that not" took place by the conclusion of the Golf Trip, rather than in the days that followed.[6]  This is far from what courts have traditionally characterized as opinion testimony, such as a DEA agent testifying that, based on his observations in a hand-to-hand drug exchange, a particular person was directing the transaction, *see United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005), or a witness offering an opinion of what a drug dealer's coded language means, *see United States v. Garcia*, 291 F.3d 127, 139 (2d Cir. 2002).

Second, even if Executive-1's "more likely than not" statement were lay opinion testimony, it would still be admissible under Rule 701. For all the reasons stated above, it is "rationally based on" Executive-1's own perceptions, and it will be "helpful" to a clear understanding of Executive-1's testimony. *See United States v. Rea*, 958 F.2d 1206 (2d Cir. 1992). The facts stated above, taken together, demonstrate that it is, in fact, more likely than not that Executive-1 discussed the merger with the defendant on or before the Golf Trip. In short, Executive-1 intended to tell the defendant, it was time-sensitive that Executive-1 do so, and during this time Executive-1 and the defendant were together for three days. And the Government has additional corroborating evidence, independent of Executive-1's testimony, that Executive-1 told the defendant about the

---

[6] The analogies the defendant lists in his brief are inapposite. The defendant compares Executive-1 to a robbery victim who testified that she "would have been" robbed by someone who "more likely than not" stole her purse. This is entirely different. To use the defendant's own analogy, Executive-1's testimony is more akin to a robbery victim who testifies that he was robbed on a Tuesday, that he is not sure the exact minute the robbery occurred but that it certainly happened before 5 p.m., and that for a host of reasons he believes it is more likely than not that it happened between 1 and 2 p.m. Such testimony would clearly be admissible, and the witness could be cross-examined on his lack of certainty about the timing.

merger: the fact that during this trip, the defendant, who had never before traded in Sprint stock, began buying unusually large amounts of the stock across several trading accounts.[7]

For all of these reasons, Executive-1 should be permitted to testify that it is more likely than not that he told the defendant about the merger on or before the Golf Trip. The Court can address the appropriateness of a limiting instruction once it sees how the testimony comes in.

## IV.  Salesperson-1's Statements Are Admissible as Non-Hearsay to Show their Effect on the Listener and to Provide Context for Later Events

The defendant moves to preclude as hearsay statements made by Salesperson-1 to the defendant's business partner ("Business Partner-1") regarding the defendant's efforts to determine Guidehouse's acquisition target. Because Salesperson-1's statements are not being offered for their truth, and instead are being offered to show the effect on Business Partner-1 and provide context for his later conversations with the defendant, they are admissible as non-hearsay and the defendant's motion should be denied.[8]

---

[7] This is different from the problematic testimony in *United States v. Kaplan*, 490 F.3d 110 (2d Cir. 2007), the case cited by the defendant (Buyer Mot. 10). In *Kaplan*, the witness testified that the defendant "knew exactly what he was getting into" when he joined the allegedly fraudulent business, but did not give any "objective factual basis from which it is possible to infer with some confidence" that the defendant knew a given fact. 490 F.3d at 119. Here, by contrast, Executive-1 is not giving a speculative opinion about what was in the defendant's head but is instead testifying about Executive-1's own recollection about when he discussed the merger with the defendant.

[8] To the extent the defendant argues that Salesperson-1 lacked knowledge of Guidehouse's interest in acquiring another company, Salesperson-1's statements would also be admissible not for their truth, but as relevant to Salesperson-1's state of mind and for the fact that they were said. *United States v. Cardascia*, 951 F.2d 474, 486 (2d Cir. 1991) ("Under the Federal Rules of Evidence, '[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, [then] the statement is not hearsay.'") (quoting Fed. R. Evid. 801(c), advisory committee's note); *United States v. Quinones*, 511 F.3d 289, 312 (2d Cir. 2007) ("This court has recognized that 'the mere utterance of a statement, without regard to its truth,' may circumstantially evidence 'the state of mind of the declarant,' and as such, does not constitute 'hearsay.'").

### A.  Factual Background

As alleged in the Indictment, the defendant began buying Navigant stock on June 13, 2019, the day after Salesperson-1 received an email from a colleague at Guidehouse regarding a potential "combination" and discussed questions posed in that email with the defendant. (Ind. ¶ 31). At trial, the Government intends to prove that the defendant learned of Guidehouse's interest in acquiring another company and was able to determine in a matter of hours that the company was Navigant, prompting his illegal stock purchases charged in Counts One and Three. The evidence will show that over the course of the next several weeks after the "combination" email, the defendant discussed his efforts to "figure out" which company Guidehouse was trying to buy with both Salesperson-1 and with the defendant's own business partner, Business Partner-1. Specifically, the Government expects Business Partner-1 to testify that he had dinner with Salesperson-1 on June 19, 2019, during which Salesperson-1 asked if the defendant had yet "figured out" which company Guidehouse was trying to buy, and informed Business Partner-1 of the defendant's efforts to do so. During the conversation with Salesperson-1, Business Partner-1 sent a text message to the defendant which read, "Who do u think Guidehouse is trying to buy?" Business Partner-1 subsequently spoke to the defendant by phone and in person, and the defendant described his efforts to determine Guidehouse' s acquisition target.

### B.  Applicable Law

"Hearsay evidence is any statement made by an out-of-court declarant and introduced for its truth." *United States v. Cardascia*, 951 F.2d 474, 486 (2d Cir. 1991); Fed. R. Evid. 801(c). "An out-of-court statement offered for some other purpose, such as to show that a statement was made, *United States v. Kohan*, 806 F.2d 18, 22 (2d Cir. 1986), to demonstrate the statement's effect on the listener, *United States v. Puzzo*, 928 F.2d 1356, 1365 (2d Cir. 1991), or to show the

circumstances under which subsequent events occurred, *United States v. Pedroza*, 750 F.2d 187, 200 (2d Cir. 1984), is not hearsay." *United States v. Certified Env't Servs., Inc.*, 753 F.3d 72, 89 (2d Cir. 2014); *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) ("a statement offered to show its effect on the listener is not hearsay").

### C.  Discussion

Here, Salesperson-1's statements are not being offered for their truth, but rather to show their effect on Business Partner-1 and to provide context for his text message and later direct conversations with the defendant. If the jury is not permitted to learn about the conversation between Salesperson-1 and Business Partner-1 during which Business Partner-1 learns of the defendant's efforts to identify Guidehouse's acquisition target, they will not understand the events that immediately followed. In other words, the jury will lack the necessary context to understand why Business Partner-1 sent the "Who do u think Guidehouse is trying to buy?" text message to the defendant, or to understand the defendant's later related statements to Business Partner-1. Because Salesperson-1's statements provide this context, they are admissible and the defendant's motion to exclude them should be denied.

## **CONCLUSION**

For the reasons set forth above, the defendant's motions *in limine* should be denied.

<div style="margin-left: 50%">

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York


By: ___/s/_____
    Jordan Estes
    Kiersten A. Fletcher
    Margaret Graham
    Assistant United States Attorneys
    (212) 637-2543/2238/2923

</div>

Dated: January 31, 2023
      New York, New York