

**Orrick, Herrington & Sutcliffe LLP**
1133 Avenue of the Americas
Suite 3100
New York, NY 10036

+1 212 600 2400
orrick.com

**Daniel R. Alonso**
Partner
E  dalonso@orrick.com
D  +1 212 600 2340
F + 1 212 600 2405

February 12, 2023

VIA ECF ONLY

The Honorable Richard M. Berman
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

  Re: United States v. Buyer, 22 Cr. 397 (RMB)

Dear Judge Berman:

  Pursuant to the Court's order of February 8 (ECF No. 74), we respectfully submit this supplemental letter motion briefly requesting several *in limine* rulings. In an effort to avoid requiring the Court's intervention, we conferred with the government and submit here only the issues on which we have been unable to agree.

1. Opinions, Thoughts, and Feelings of Attorney-Interviewers

  As the Court is aware from the government's pending motion *in limine*, (ECF No. 62), the government intends to introduce statements Mr. Buyer made to outside counsel for Guidehouse on October 31, 2019 ("Interviewer-1" and "Interviewer-2"). The pending motion is over whether the government will be allowed to offer only a portion of the statement or whether the jury should be allowed to hear the entire statement under the rule of completeness. Recent 3500 material reflecting interviews with the two lawyers involved in the interview make clear that the government not only wants to introduce the *statements* Mr. Buyer made, but also highly prejudicial *characterizations* of Mr. Buyer based on those statements and the interview itself. The interview was conducted telephonically and, depending on whom one asks, lasted between five and fifteen minutes.

  Examples of the objectionable characterizations the lawyers have made include:[1]

- Interviewer-1 said that Mr. Buyer's explanation of why he bought Navigant stock did not make sense to him.

---

[1] We have not burdened the Court with the entirety of the reports containing these statements, but they are of course available at any time.

The Honorable Richard M. Berman
February 12, 2023
Page 2



- Interviewer-1 said that Mr. Buyer seemed ready for the phone call, as if he had his "story" sitting on a post-it note on a monitor waiting for the day he would be asked; Interviewer-2 thought Mr. Buyer was prepared to talk about transactions that had occurred months earlier, and thought he had a prepared response because his trading activity was problematic.
- Interviewer-1 thought to himself, "This guy is an idiot because he is going to do something stupid if he hasn't already," and then thought "maybe not because he already has his story straight."
- Interviewer-1 told Mr. Buyer not to "delete anything," because according to him, Interviewer-1 had real concerns that something bad had occurred.
- Interviewer-1 had recently testified in an unrelated federal criminal case where he had had an unpleasant experience, and thought, "Oh crap I'm going to have to testify in a federal criminal case again."
- Interviewer-1 told the government that he was working on an unrelated "insider guessing" case at the time and he was trying to figure out himself whether this case was also such a case.
- Interviewer-1 said that Mr. Buyer seemed offended that he had been accused of insider trading, when Interviewer-1 says he had not accused him of insider trading; Interviewer-2 similarly recalled Mr. Buyer saying he did not want an "implication" that what he had done was insider trading when they had not mentioned insider trading.
- Interviewer-1 recalled that Mr. Buyer was a former Congressman, and said he immediately developed a bad opinion of him.
- After his previous interviews earlier the same day had not revealed wrongdoing, Interviewer-1 thought "Uh oh" after interviewing Mr. Buyer.
- Interviewer-2 characterized Mr. Buyer as arrogant during the interview.
- Interviewer-2 said that the fact that Mr. Buyer had sent a copy of a published investment recommendation to his son on the day he traded seemed like an effort to make a record.

These are not all of the statements, but they accurately reflect the tenor of the testimony the government has told us it plans to elicit. The defense strenuously objects, and asks the Court to direct the government to elicit the content of the statements, without characterization.

    The proposed testimony would constitute improper expert testimony under Fed. R. Evid. 702, as well as improper lay opinion under Rule 701. Both Interviewer-1 and Interviewer-2 are veteran internal investigators of securities fraud at Schulte, Roth & Zabel LLP, and previously worked for many years at Bracewell & Giuliani LLP. Interviewer-1 was an SEC enforcement attorney and a Special Assistant U.S. Attorney who handled criminal securities fraud cases. Their giving the above opinions, plainly based on their specialized knowledge, would essentially be the government asking *sub silentio,* "Experienced investigators, in your expert opinion, is the defendant guilty?" Even if that were proper—which, of course, it is not—the government has not provided expert notice or a report, as it is required to do under Fed. R. Crim. P. 16(a)(1)(G) and the Court's scheduling order (ECF No. 55). Nor can their ruminations qualify as lay opinion under



Rule 701, as that rule requires that such opinions may *not* be "based on scientific, technical, *or other specialized knowledge* within the scope of Rule 702." Fed. R. Evid. 701(c); *see United States v. Garcia,* 413 F.3d 201, 216 (2d Cir. 2005) ("We hold that the foundation requirements of Rule 701 do not permit a law enforcement agent to testify to an opinion … if the agent's reasoning process depended, in whole or in part, on his specialized training and experience."). Clearly, investigative sense from years of securities investigations qualifies as "specialized knowledge." *See Trejos Hermanos Sucesores S.A. v. Verizon Commc'ns Inc.*, No. 21 CV. 8928 (JLR), 2023 WL 24237, at *2 (S.D.N.Y. Jan. 3, 2023) (attorney-witness's testimony improper when based on "technical, specialized knowledge as an attorney and constitutes legal analysis and conclusions.").

To the extent that any of the observations of Interviewer-1 and Interviewer-2 are not based on their specialized knowledge but rather their personal perception, such as of Mr. Buyer's supposed "arrogance," these should be precluded as well. "Recognizing that eyewitnesses sometimes find it difficult to describe the appearance or relationship of persons, the atmosphere of a place, or the value of an object by reference only to objective facts, the law permits such witnesses to testify to their personal perceptions in the form of inferences or conclusory opinions." *See Garcia,* 413 F.3d at 211. But any lay observations by the expert interviewers involved none of those things, and were in any event based on a *telephonic* interview that lasted an exceedingly short time, not on the typical eyewitness's ability to observe demeanor. *Compare United States v. Scott,* No. 21 Cr. 429 (AT), 2022 WL 1026725, at *6 (S.D.N.Y. Apr. 5, 2022) ("[T]he Court finds that the testimony will be helpful because Reynoso had the opportunity to observe Defendant's gait, facial features, and demeanor for a substantial period of time."). Moreover, Rule 701 also requires that the lay opinion be "helpful to clearly understanding the witness's testimony or to determining a fact in issue." Fed. R. Evid. 701(b). Nothing about the characterizations of these interviewers, however, has any bearing on their relaying to the jury what Mr. Buyer actually said, which is in any event self-explanatory. All it will end up doing is telling the jury that Mr. Buyer's statements should not be believed, which would be wholly improper. *United States v. Grinage,* 390 F.3d 746, 750–51 (2d Cir. 2004) (function of jurors is usurped, not helped, by lay opinion testimony from a lay witness cloaked in "an aura of expertise and authority" that tells the jury not only "what was in the evidence" but also "what inferences to draw from it.").

Finally, the evidence should be excluded under Rule 403 because the prejudicial effect of these conclusory opinions would far outweigh their probative value. The probative issue is what Mr. Buyer said to the interviewers, and the government may argue any fair inference from those statements. But the characterizations of the interviewers would distract the jury from the statements themselves and lead them to focus on these two eminent lawyers and their negative opinions of the man they interviewed for a few minutes by telephone three years ago.

2. Irrelevant and Prejudicial Text Messages with Individual-1

Pending before the Court is our motion *in limine* to preclude evidence of an affair with Individual-1. ECF No. 63. We hope the Court will grant that motion, but whether it is granted or not, the government intends to offer a number of more detailed items that reflect familiar, romantic,

The Honorable Richard M. Berman
February 12, 2023
Page 4



and flirtatious expressions between the two, all of which are utterly irrelevant to the issues at hand and will only serve to further inflame the jury. (Notably, none of the communications concerns the issues in this case or stock trading in general.) Although the government has advised that it considers such evidence necessary to explain the relationship between Mr. Buyer and Individual-1, the closeness of that relationship will not be in issue: whether the Court receives evidence of the earlier romantic nature of the relationship or not, we will not contest that the two had a close relationship that continued past the events at issue in the case. Indeed, that is why Individual-1 trusted Mr. Buyer to open and manage a brokerage account for her, and why he sought to make money for her in the stock market. That is it—there is no reason to gild the lily by subjecting the jury to the actual words of affection spoken between them.

The exhibits at issue are GX 402, a series of text messages between Mr. Buyer and Individual-1 from August 18, 2016 through October 23, 2017 (before the events in the indictment); GX 401, which contains a series of texts between the two from 2021 (long after the events in the indictment); and GX 306, an email in which Mr. Buyer sent photos of Individual-1's daughter's wedding in 2019 and wrote "you are beautiful." Other topics discussed are hot-button political topics like abortion (Individual-1 stridently expressed that she is pro-life and was very negative about pro-choice women) and political debates including admiration for former Vice President Mike Pence (GX 402), discussions of getting together and phrases like "miss you" (GX 401). Notably, GX 402, which the government told us it intends to offer, is 383 pages long. Adding to the prejudice is that within the text strings and in his phone, Individual-1 is referred to by what the government says is a code name, "Leo." This code name also shows up in a series of documents (GX 413-15) that the government also seeks to introduce, which contain nothing but Mr. Buyer's passwords from his iPhone, many of which contain the string "leo." There is no reason to offer any of this other than to tar Mr. Buyer with the stink of infidelity and conservative political beliefs.

A few of the texts within GX 402 contain evidence of modest financial support extended by Mr. Buyer to Individual-1. Again, that they had a close relationship and that Mr. Buyer wanted to help her financially is not in issue. Indeed, we have offered repeatedly to stipulate to Individual-1's entire testimony but the government has refused. If the prosecutors force her to testify, then we agree that the texts about financial support are modestly relevant and not overly prejudicial. But the entirety of the rest of the text messages should be precluded. The defendant simply cannot get a fair trial if he has to face a New York jury that has heard him discussing right-to-life issues and praising Republican politicians when those issues have no bearing on the case.

3. <u>Legend Contained Within the Signal Text Screenshot</u>

As the Court will recall from our pre-trial motions (ECF No. 31), the government seized a screenshot of a text message (the "Signal Text Screenshot") that Mr. Buyer made for the purpose of discussing it with his lawyers. The Court has ruled that it was not seized in violation of Mr. Buyer's attorney-client privilege or the work product doctrine, and although we disagree, we of



course accept the Court's ruling. As a matter of evidence law, however, the Court should not allow the government to introduce a legend that appears at the bottom of the Signal Text Screenshot:



The government included the Signal Text Screenshot in the indictment as evidence of what it termed "The Cover-Up" and emphasized that it was sent via an "encrypted messaging application." Ind. Par. 39. The parties will differ as to that interpretation, but the contents of the message itself are admissible as an admission of a party opponent. The legend, however, will be without foundation, is rank hearsay and should be excluded.

It is important to recall that the government does *not* have any evidence of the original text message, but only has the "photograph" (screenshot) that Mr. Buyer made of it. We also have not been given notice that any expert on Signal or messaging applications in general will testify about what "disappearing messages" are or how they work. The government obviously wants the sinister implication that Mr. Stansbury ("Salesperson-1" in the indictment) in fact set messages to self-destruct in 5 minutes—the truth of the legend's content—because there is something secret about messages with Mr. Buyer that he did not want someone to see. Not only is there no foundation that that is in fact what Mr. Stansbury did, but whatever he did has nothing to do with Mr. Buyer—yet only *Mr. Buyer* will suffer the consequences of the implication. As such, not only is the legend unfounded hearsay, but any probative value it has is far outweighed by its prejudicial effect. We have asked the government to consent to redacting the legend, but it has refused.

4. <u>Evidence of Wealth—Consulting Invoices Reflecting Large Fees</u>

The government has expressed its intention to offer a series of contracts, purchase orders, and invoices relating to Mr. Buyer's consulting businesses. We have no objection to the introduction of these documents, but ask the Court to order that they be redacted to delete any reference to the specific amounts Mr. Buyer charged as a consultant. These amounts are utterly irrelevant to the issues in the case, and will only serve to underscore for the jury that the defendant was a highly paid Washington insider. The dollar amount is irrelevant to the issues in the case, which center around his *relationship* with the companies for whom he consulted and not how much he made in those jobs. *See Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, No. 04 CIV 10014 PKL, 2009 WL 3111766, at *6 (S.D.N.Y. Sept. 28, 2009) (excluding exact dollar amount of compensation where such information would not advance plaintiff's theory).

The Honorable Richard M. Berman
February 12, 2023
Page 6



    The documents to which this applies are marked GX 202, 204, 212, 215, 220, and 221 (Guidehouse invoices); GX 115 (T-Mobile purchase order); GX 226, 250, and 434 (PwC agreements); GX 100 (T-Mobile agreement); GX 435 and 439 (Maximus, and Gilead agreements);[2] and GX 252 (Guidehouse communication). An example is this excerpt from GX 202:

> Pursuant to the Consulting Agreement Federal Relations:
>
> Invoice Submitted in May                              $30,000
>
> **Total Payable to Steve Buyer Group, LLC:**        **$30,000.00**

The rest of the documents are variations on the theme, with some constituting bills for services rendered and other contracts for future work.

    We ask the Court to exclude these payment details. This case is replete with irrelevant details—some of which are the subject of pending motions—that may or may not come into evidence, all of which will have the effect of inflaming the jury's passions. These include the fact that the defendant is a Republican being tried in overwhelmingly liberal New York, was on Donald Trump's transition team (see below), is alleged to have had an affair, and plays golf at Trump country clubs. We urge the Court to keep this one out—how much he made as a consultant has no bearing on the case, but risks turning the jury against Mr. Buyer and depriving him of a fair trial.

5. <u>Trump Transition Team</u>

    Few names are as toxic in the five counties that make up the jury pool of the Southern District of New York's Manhattan courthouse as that of Donald J. Trump. Because he had been Chair and Ranking Member of the House Veterans Affairs Committee, and because he himself was a veteran who had long championed veterans' issues, Mr. Buyer had extensive knowledge of the Veterans Administration. As such, he was asked in 2016 to serve on Trump's transition team, specifically on the "VA agency team" dedicated to veterans' policy issues. The government has indicated that it intends to present evidence of Mr. Buyer's membership on the transition team in order to show his expertise and the background of the relationship with his consulting clients, particularly T-Mobile and Guidehouse. It is one thing to be a Republican defendant in this district, but quite another to have one's name associated with Donald Trump. Because Mr. Buyer's expertise and relationships will be apparent from all the circumstances in the case, including his 18 years in Congress, there is no reason to utter the word "Trump" in this trial.

    In the five relevant counties (New York, Bronx, Westchester, Rockland, and Putnam), registered voters identifying as something other than Republican make up a whopping 88% of the approximately 2.9 million registered voters. *Enrollment by County*, N.Y. State Bd. of Elections

---

[2] We reserve the right to object at trial to these three agreements on relevance grounds.



(Feb. 21, 2022). Democrats make up approximately 64% (about 1.8 million) of all registered voters, Republicans 12% (about 338,000), and the rest are either unenrolled or register in minor parties. *Id.* In years past, perhaps jurors as a whole could be expected to set aside any inherent biases for the greater good, but recent social science research reveals that the political identity of Americans is more polarized than ever. A Pew Research study from September 2019, for example, found that "[m]embers of both parties are now substantially more likely to say those in the other party are more immoral than other Americans than they were three years ago. Today, 47% of Democrats say this of Republicans, up from 35% in 2016." Pew Research Center, *Partisan Antipathy: More Intense, More Personal* (October 10, 2019), at 18. Crucially for this case, this distrust is amplified for "political elites" like "members of Congress." James N. Druckman & Matthew S. Levendusky, *What Do We Measure When We Measure Affective Polarization?, in* 83(1) Public Opinion Quarterly 114, 115, 120 (2019).

New Yorkers do not need social science to tell them what they know to be true: that a defendant perceived to be an ally of Donald Trump—even if, as here, that is untrue—will have an exceedingly difficult time getting a fair trial here. The government should be precluded from eliciting Mr. Buyer's 2016-17 membership on the Trump transition.

\* \* \* \*

We appreciate the Court's permission to file these supplemental motions, all of which arose in response to the voluminous 3500 material and exhibits the government provided since we filed our original motions *in limine* (with respect to the Trump transition, the government originally told us it would not seek to offer that fact, but has since changed its position). Should additional issues arise where the Court would benefit from briefing in advance, we reserve the right to submit additional briefing for the Court. And of course, as issues arise during trial, we will raise objections or bring them to the Court's attention at the time.

Thank you for your consideration.

Respectfully submitted,

/s/ *Daniel R. Alonso*
Daniel R. Alonso

cc:      All counsel (by ECF)