## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>STEPHEN BUYER,<br><br>              Defendant. | 22-cr-00397-RMB |

## SENTENCING MEMORANDUM ON BEHALF OF STEPHEN BUYER

Henry W. Asbill
ORRICK, HERRINGTON & SUTCLIFFE LLP
2001 M Street NW
Washington, DC 20036
Tel: (202) 349-8007
hasbill@orrick.com

Olivia A. Rauh
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Tel: (212) 600-2343
orauh@orrick.com

*Attorneys for Defendant Stephen Buyer*

## <u>TABLE OF CONTENTS</u>

**Page**

**<u>PERSONAL HISTORY</u>** ................................................................................................. 1

    I. Childhood ............................................................................................................... 1

    II. Education and Military Service ............................................................................ 1

    III. Congressional Service ........................................................................................ 4

    IV. Family and Personal Life .................................................................................... 7

**<u>SENTENCING ANALYSIS</u>** .................................................................................... 12

    I. The Guidelines Calculation ................................................................................ 13

    II. Relevant Section 3553(a) Factors .................................................................... 15

        A. Mr. Buyer's History and Characteristics................................................... 15

        B. The Nature and Circumstances of the Offense............................................ 17

        C. Incarceration is Unnecessary to Achieve the Aims of Sentencing................. 18

            1. Financial and Professional Consequences ........................................... 19

            2. Family and Reputational Harm............................................................ 19

        D. A Non-Custodial Sentence Will Not Cause Unwarranted Sentencing
           Disparities ................................................................................................. 20

        E. Restitution................................................................................................. 20

**<u>CONCLUSION</u>** ...................................................................................................... 21

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                          **Page(s)**

*Rita v. United States*,
    551 U.S. 338 (2007) ........................................................................................12, 15

*Simon v. United States*,
    361 F. Supp. 2d 35 (S.D.N.Y. 2005) ...........................................................13

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) ..........................................................18

*United States v. Canova*,
    412 F.3d 331 (2d Cir. 2005) ........................................................................16

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008) ........................................................................12

*United States v. Gaind*,
    829 F. Supp. 669 (S.D.N.Y. 1993) ..............................................................18

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 20 12), aff'd, 747 F.3d 111 (2d Cir. 2014) ...............12, 18, 19

*United States v. Huntley*,
    961 F. Supp. 2d 409 (E.D.N.Y. 2013) .........................................................16

*United States v. Johnson*,
    612 F.3d 889 (7th Cir. 2010) .......................................................................14

*United States v. Johnson*,
    No. 16-CR-457-1(NGG), 2018 U.S. Dist. LEXIS 71257
    (E.D.N.Y. Apr. 26, 2018) ............................................................................19

*United States v. Jones*,
    531 F.3d 163 (2d Cir. 2008) ........................................................................12

*United States v. Kerley*,
    544 F.3d 172 (2d Cir. 2008) ........................................................................15

*United States v. Kimbrough*,
    552 U.S. 85 (2007) ......................................................................................13

*United States v. Rosario*,
    988 F.3d 630 (2d Cir. 2021) ........................................................................15

*United States v. Stewart*,
    590 F.3d 93 (2d Cir. 2009) ..........................................................................12

*United States v. Thompson*,
    808 F.3d 190 (2d Cir. 2015) .................................................................15

*United States v. Torres*,
    464 F. Supp. 3d 651 (S.D.N.Y 2020) ...................................................16

*United States v. Woodard*,
    239 F.3d 159 (2d Cir. 2001) .................................................................15

**Statutes**

18 U.S.C. § 1348 ............................................................................................20

18 U.S.C. § 1621 ............................................................................................15

18 U.S.C. §3553(a) ...................................................................................12, 15

18 U.S.C. § 3553(a)(1) ...................................................................................15

18 U.S.C. § 3553(a)(6) ...................................................................................20

U.S.S.G. § 2B1.1 ...........................................................................................20

U.S.S.G. § 2B1.4 ...........................................................................................20

U.S.S.G. § 3C1.1 ...........................................................................................15

U.S.S.G. § 5H1.11 .........................................................................................16

U.S.S.G. § 5K2.0(a)(2) ..................................................................................16

**Other Authorities**

Interactive Data Analyzer, United States Sentencing Commission,
    *https://ida.ussc.gov/analytics* (last visited June 7, 2023) ......................20

Defendant Stephen Buyer will come before this Court for sentencing on July 11, 2023, after a jury trial on a four-count indictment relating to insider trading. He intends to appeal his convictions. We ask that the Court substantially depart or vary from the United States Sentencing Guidelines, for the reasons set forth below and those that will be advanced at the sentencing hearing, and to impose a non-custodial sentence of home confinement and community service.[1]

## PERSONAL HISTORY

### I. Childhood

Mr. Buyer was raised on a small farm in rural Indiana as part of a very close-knit family and community. The family of six shared an 800 square foot home along the Tippecanoe River. ECF No. 129 ("PSR") ¶ 64; Ex. VV (June 12, 2023 S. Buyer Ltr.). His town had a population of approximately 200 people. PSR ¶ 64. Growing up, he and his three siblings—Diane, Karen, and John—learned the value of hard work by helping their parents tend to the family's small organic farm. *Id*. They also came to understand the honor and sacrifice of military service through their father and grandfather, both of whom served in the U.S. Army during the Korean War and World War I, respectively, and through their family's active involvement in initiatives to support veterans once they returned home. *Id* ¶ 66. Their parents instilled in them the importance of discipline and giving back, igniting a young Mr. Buyer's passion for service.

### II. Education and Military Service

These values led him and his brother John to continue the family tradition of military service. Mr. Buyer served in the Army Reserves in peace and in war for over 30 years with 4 years of active duty. PSR at 30. Like his father and older brother, he attended The Citadel, the Military

---

[1] Although we believe a non-guidelines sentence is appropriate here, we thank Mr. Hay for the comprehensive Presentence Investigation Report (the "PSR") and do not take issue with any of his findings.

College of South Carolina. "As a Citadel cadet, Mr. Buyer lived by the school honor code — A cadet does not lie, cheat, or steal or tolerate those who do. In my experience, he carried this code forward into his professional life and expected his [Congressional] staff to conduct themselves the same way." Ex. A (May 8, 2023 J. Lariviere Ltr.). To this day, Mr. Buyer is "a proud alumnus of The Citadel and he carries the sense of duty and honor that was instilled there." Ex. B (May 1, 2023 H. Brown Ltr.). As a way of giving back, Mr. Buyer and his father created an endowment at The Citadel to award academic scholarships to the Regimental cadet leadership, called "The Buyer Family Top Leadership Scholarship." In 2005, his alma mater and classmates recognized him by naming the Buyer Auditorium in his honor. *Id.*; Trial Tr. at 1171:14-20 (J. Lariviere). The commemorative plaque reads:

> The Honorable Stephen Earle Buyer
> The Citadel Class of 1980
> U.S. House of Representatives 1993-2011
> Hoosier – Soldier – Lawyer – Statesman
>
> The renovated Mark Clark Auditorium
> was renamed for Congressman Buyer
> on November 11, 2005
> and made possible through
> the generous gifts of the Class of 1980.

Following his graduation from the Citadel in 1980, he was commissioned as a Second Lieutenant of the reserves. PSR ¶¶ 86, 88. He received a delay from active duty in order to pursue his J.D. from Valparaiso University School of Law, becoming a member of the Indiana and Virginia Bars in 1984 and 1987. *Id* ¶¶ 85, 87. After law school, his branch transferred to the Judge Advocate General Corps, where he was on active duty for three years. *Id* ¶ 88. As a Staff Judge Advocate Officer at Fort Eustis, he served as a Special Assistant U.S. Attorney in Virginia. *Id.* Upon his release from active duty, Mr. Buyer continued reserve services and deployed with the 310th Theater Army Area Command to the Netherlands and Belgium. He then returned home and

resumed his legal career. He was a sole practitioner for three years and an Indiana State Deputy Attorney General for about nine months. *Id* ¶ 93. He continued his duties as a citizen-soldier, participating in three exercises in the Netherlands and Germany with the 21st TAACOM.

During the 1990-1991 Gulf War, Mr. Buyer was called to active duty in Iraq on three days' notice for Operation Desert Shield/Desert Storm. *Id* ¶ 88. He lost his law practice. As a Captain, Mr. Buyer's primary duty was acting as an Operational Law Judge Advocate where he provided legal advice to forward-deployed combat service support units within the combat zone of operations. *Id*. Additionally, he provided legal advice to the Commander, 22nd Support Command, and was assigned to the Western Enemy Prisoner of War ("POW") Camp to provide legal advice on international law and the Geneva Conventions regarding the treatment of POWs, detained civilians, and refugees. Ex. VV (June 12, 2023 S. Buyer Ltr.).

As Colonel MacIntyre recalls, Mr. Buyer enforced strict adherence to these laws and standards in the POW camps they operated for over 40,000 Iraqi soldiers. Ex. C (Apr. 4, 2023 L. MacIntyre Ltr.). Thanks to his efforts, which earned him the Bronze Star Medal for meritorious service, there were never any allegations of prisoner mistreatment or Geneva Convention violations. *Id*; Ex. D (May 5, 2023 T. Jones Ltr.). Lieutenant Colonel Bandini adds that Mr. Buyer actively "volunteered for duty across the line into Iraq to ensure the law of land warfare was properly obeyed," instead of remaining where he was, in the safer and more comfortable living quarters of the 22nd Support Command. Ex. E (Apr. 8, 2023 V. Bandini Ltr. No. 2).

Because of his outstanding military service, Mr. Buyer rose to the rank of full Colonel in 2002. *See* Ex. F (Apr. 12, 2023 D. Galloway Ltr.); PSR ¶ 89. Over the course of his military career, Mr. Buyer received numerous awards and merits for his service, including: (1) most notably, the Legion of Merit, awarded by the Secretary of the Army; (2) the Bronze Star Medal; (3) the

3

Meritorious Service Medal; (4) the Army Commendation Medal with Oak Leaf Cluster; (5) the Army Achievement Medal; (6) the Army Reserve Components Achievement Medal; (7) the National Defense Service Medal; (8) the South-West Asia Service Medal; (9) the Armed Forces Reserve Medal; (10) the Kuwait Liberation Medal Saudi Arabia; (11) the Kuwait Liberation Medal Kuwait; (12) the Army Service Ribbon; (13) the Army Components Overseas Training Ribbon; and (14) the Indiana Military Department's Distinguished Service Medal Oak Leaf Cluster. PSR ¶ 89. Mr. Buyer retired from the military in August of 2010. *Id* ¶ 88; Ex. VV (June 12, 2023 S. Buyer Ltr.).

### III. Congressional Service

Mr. Buyer served as United States Congressman for two districts in Indiana from 1993 to 2011. While in office, he "carried the torch for our military and especially for veterans and their families." ECF No. 123 (Apr. 26, 2023 J. Bauerle Ltr.). He "worked tirelessly for all veterans" to ensure "they received the respect and help they deserved." Ex. G (May 10, 2023 B. Hughes Ltr.). In his 18 years in Congress, Mr. Buyer served on a number of committees and subcommittees, including: (1) the House Committee on Energy and Commerce and its Subcommittee on Communications and Technology, which had oversight over the telecommunications industry; (2) the House Committee on Veterans' Affairs ("HVAC"), serving at different times as chairman and ranking member; (3) the House Armed Services Committee and its Subcommittee on Military Personnel, and (4) the Judiciary Committee. *See* PSR ¶ 92.

During his tenure, Mr. Buyer's legislative achievements were significant and impactful. *See e.g.,* Ex. H (summary of legislative accomplishments); Ex. VV (June 12, 2023 S. Buyer Ltr.). Undoubtedly, Mr. Buyer's "capstone accomplishment" is the TRICARE For Life health insurance program, which to this day provides retired members of the military with secondary coverage to

Medicare, to help reduce out of pocket costs for medical and dental care. ECF No. 123 (Apr. 26, 2023 J. Bauerle Ltr.); Pub. L. No. 106-389. As chairman of the House Armed Services Committee Military Personnel Subcommittee, Mr. Buyer authored this legislation. Ex. H (summary of legislative accomplishments). Mr. Buyer's chief-of-staff and later business partner, Mike Copher, testified that this program was deeply important to Mr. Buyer. Tr. at 137:21-138:18 (M. Copher). He felt strongly that retired military personnel should have free and comprehensive medical care for life, in exchange for 20 or more years of service. He is "widely known through[out] veterans organizations" and "to thousands of military veterans and retirees" for his leadership in Congress to establish this program, making "a difference in the lives of countless military retirees." Ex. C (Apr. 4, 2023 L. MacIntyre Ltr.); Ex. I (Apr. 18, 2023 J. Oyler Ltr.); Ex. J (Apr. 8, 2023 V. Bandini Ltr. No. 1).

As chairman of the HVAC, Mr. Buyer furthered his commitment to veterans, sponsoring responsible legislation, working across the aisle, and never deviating from that mission. Ex. K (Apr. 20, 2023 M. Brinck Ltr.); Ex. L (May 15, 2023 R. Ciaruffoli Ltr.). He spearheaded the passage of the Veterans' Benefits, Health Care, and Information Technology Act of 2006 to provide veterans and their dependents or survivors with improved benefits, memorial affairs, and health care programs. Ex. A (May 8, 2023 J. Lariviere Ltr.); Pub. L. No. 109-461. As ranking member of the HVAC, in response to the 2007 Walter Reed Hospital scandal, he worked on legislation ultimately included in the National Defense Authorization Act for 2008. Ex. A (May 8, 2023 J. Lariviere Ltr.); Pub. L. No. 110-181. To honor Mr. Buyer's service on the HVAC, his portrait was dedicated by the Speaker of the House, Rep. John Boehner, and displayed in Congress.

"In addition to these detailed examples, Mr. Buyer worked on a myriad of other issues including increased pay and benefits for serving military personnel, creation of the Thrift Savings

Program for active-duty service members, partial elimination of the disability payment offset of military retirement pay, the creation of VA Polytrauma Centers to assist combat veterans with traumatic brain injuries and legislation in support of veterans suffering from Gulf War Illnesses. These actions demonstrate Mr. Buyer's deep concern throughout his career for military personnel and veterans from the day they reported to boot camp to the day they are buried in a VA cemetery." Ex. A (May 8, 2023 J. Lariviere Ltr.). He also expanded veteran-to-veteran outreach for readjustment, mental health services, and suicide prevention and started advocating for veteran telehealth services as early as 2006. Ex. M (Apr. 23, 2023 D. Buyer Ltr.).

As Congressman, Mr. Buyer had "one of the lowest turnovers of staff." Tr. at 54:9-19 (M. Copher). He was good to work for and regularly "encouraged staff to – if they didn't agree with his positions, to come in and talk to him about it." *Id*; *see also* Ex. I (Apr. 18, 2023 J. Oyler Ltr.) ("Not all members of Congress are easy to work for, but Steve was an outstanding boss. He was a caring person and was respected by his staff."); Ex. N (May 4, 2023 J. Faker Ltr.) (describing Mr. Buyer as "an honorable and pugnacious" Congressman "who ensured his staff was well trained, morally fit and empowered to do 'what is right for the constituents.'").

After leaving Congress, Mr. Buyer built two successful government affairs consulting businesses and enlisted his former chief-of-staff, Mr. Copher, as his business partner. With no additional employees or formal offices, they provided consulting services to over 30 prominent corporate clients. This included strategic advice on the telecommunication, healthcare, and energy and commerce industries, and any expected or pending legislation that could impact those industries. Through his consulting work, Mr. Buyer continued to provide advice and expertise on veterans' affairs, particularly in the healthcare space.

### IV. Family and Personal Life

In 2011, Mr. Buyer announced his retirement from Congress when his wife, Joni, was diagnosed with systemic lupus erythematosus, an autoimmune disease exacerbated by stress. *See* PSR ¶ 69; Tr. at 188:4-5 (M. Copher) (explaining that Mr. Buyer left Congress when Joni got sick). Without hesitation, he made the decision to leave Congress to decrease the stress in her life and provide care for her through her illness. *See* PSR ¶ 69. He immediately began researching and designing a nutritional program for Joni that placed her condition into quiescence. *Id*. "It was a moment in time that defined [his] true character" because "[h]e gave up the love of his work in Congress for the love of his life." Ex. M (April 23, 2023 D. Buyer Ltr.).

Joni Buyer was Mr. Buyer's childhood friend and high school sweetheart. They have been married for over 40 years, have two adult children, Colleen and Ryan, and six grandchildren. In September 2022, Joni petitioned for a dissolution of marriage after he disclosed his brief affair over 16 years ago, which he regrets deeply. "Although his wife declined to discuss the circumstances of their dissolution of marriage, she spoke fondly of [Mr.] Buyer being a great and loving father and grandfather." PSR ¶ 71. Even with the pending divorce, Joni continues to believe in Mr. Buyer's innocence despite his conviction. *Id*.

Mr. Buyer has been and continues to be instrumental in the lives of his children and grandchildren. In a letter of support for her father, Colleen explains, "throughout my entire life, he has taught me to be a leader, confident, respectful, kind, generous, strong-willed, independent, honest, outspoken, and loving. I demonstrate all of these characteristics and he has been instrumental in shaping the individual that I am today." Ex. O (May 18, 2023 C. Buyer Ltr.). Her father helped her escape a 10-year toxic and abusive marriage. *Id*; Ex. M (April 23, 2023 D. Buyer Ltr.). As Mr. Buyer's sister, Diane, recounted, "Colleen does not know, but Steve protected her

with nightly vigils outside her home and neighborhood when she boldly left." Ex. M (April 23, 2023 D. Buyer Ltr.). In support of his father, Ryan asks the Court for leniency in its sentencing considering his father's "positive history and background." PSR ¶ 71.

All three of Mr. Buyer's siblings maintain a close relationship with him—supporting him by traveling from Indiana to New York for the duration of his trial and drafting letters to this Court on his behalf. *See* PSR ¶ 68; Ex. TT (May 25, 2023 J. Buyer Ltr.); Ex. M (April 23, 2023 D. Buyer Ltr.); Ex. P (May 17, 2023 K. DiNardo Ltr.). After sitting through the two-week trial, his siblings are upset about what they believe to be a wrongful conviction. *Id.* Mr. Buyer also has the support of his brother-in-law, a retired police chief who served in law enforcement for 39 years. *See* Ex. RR (May 28, 2023 T. DiNardo Ltr.).

In addition to his family's support, 38 of his friends felt compelled to write this Court because Mr. Buyer's conviction is not consistent with their view and substantial experience with his character of honor, duty, respect, integrity, honesty, trustworthiness, and ethics. *See e.g.,* Ex. Q (May 4, 2023 M. Michaud Ltr.) (describing the conviction as "shocking and completely out of character with everything else he has done in his life since I have known him"); Ex. L (May 15, 2023 R. Ciaruffoli Ltr.) (same); Ex. D (May 5, 2023 T. Jones Ltr.) (finding the conviction "totally out of character"); Ex. R (May 4, 2023 D. Murphy Ltr.) (same); Ex. A (May 8, 2023 J. Lariviere Ltr.) (same); Ex. S (Apr. 26, 2023 M. Menchinger Ltr.) (same); Ex. T (Apr. 23, 2023 D. Kaucheck Ltr.) (same). Many of these letters are written by retired General Officers and Commanders of the U.S. military and, pursuant to those positions, had General Court Martial convening authority under the Uniform Code of Military Justice ("UCMJ").

The former General Officers and unit Commanders, who were former Commanding General UCMJ Court Martial Convening Authorities and presided over felony trials, shared the

following opinions of Mr. Buyer's character and asked the Court to consider his entire life of service and integrity:

- **Lieutenant General John Rossa:** "I have known Congressman Steve Buyer for 20 years . . . Steve embodies the core values of honor, duty, respect, and integrity. I never once had any reason to doubt his character or work ethic. He is well respected across the board . . . For Steve Buyer to be convicted of insider trading is incompatible and inconsistent with the character of the man that I know." Ex. PP (May 24, 2023 J. Rosa Ltr.).

- **Major General James Lariviere:** "I believe this conviction is out of character with the individual I have known and worked with for over forty years . . . given Mr. Buyer's extraordinary lifetime of selfless service in the military and to the American people . . . [a] lengthy prison sentence would be a tragic end to a career dedicated to serving others." Ex. A (May 8, 2023 J. Lariviere Ltr.).

- **Major General Paul Bergson:** "In my 30 years of friendship with Steve, I have always found him to be an honest, God-fearing man who devoted his professional and military life to improving the lot of his fellow citizens. I find the act for which he has been convicted to be completely out of character for the good man that I know . . . I humbly ask you to consider all the good that Steve has done throughout his entire life as you consider his sentence." Ex. UU (May 8, 2023 P. Bergson Ltr.).

- **Major General Timothy Wright:** "I have known Steve Buyer since 1985 . . . Steve has always been a person of honesty and integrity. I am asking you to consider the totality of his life, which is not endemic of his crime and completely out of character for him." Ex. BB (Apr. 18, 2023 T. Wright Ltr.).

- **Major General Jeff Phillips:** "Always displaying great integrity, he was a crusader for the troops . . . Convict[ion] seems so out of character within the context of my own experience of [Mr. Buyer's] service to others and to the Constitution." Ex. KK (May 9, 2023 J. Phillips Ltr.).

- **Major General George Wells:** "I am a retired Major General, US Army, and have known Steve Buyer for over 30 years in both a professional and civilian capacity. I was both shocked and disturbed to hear of his recent conviction in New York of insider trading charges. I am writing today to share with you the positive impacts Steve has made in support of our nation, soldiers, veterans, the community and on me personally. It is my solemn hope that by sharing this information, the court will yield compassion and mercy in the determination of his sentence." Ex. X (Apr. 17, 2023 G. Wells Ltr.).

- **Major General David Kaucheck:** "To say that I was both surprised and saddened to learn of his conviction for insider trading, an act totally out of character of the Officer and Congressman I know, would be an understatement . . . [I ask the Court]

to weigh any sentence it may impose for the act upon which Steve has been convicted against the magnitude of the overall positive contributions Steve has made." Ex. T (Apr. 23, 2023 D. Kaucheck Ltr.).

- **Major General Tom Jones:** "I am writing in support of Stephen Buyer, whom I have known both personally and professionally for some 35 years. I was saddened and disappointed when I learned of his conviction in your court because this seemed to be so totally out of character with the man I greatly respect and admire." Ex. D (May 5, 2023 T. Jones Ltr.).

- **Major General James Bauerle:** "I write today to inform the court of [Mr. Buyer's] performance to the men and women of our unit and to hope you take into account the many good things Steve has done in service to his country. In the military when a service member undergoes UCMJ proceedings, their prior record of performance is also considered to mitigate the final outcome. I hope you will positively consider Steve Buyer for his significant contributions." ECF No. 123 (Apr. 26, 2023 J. Bauerle Ltr.).

Several former Colonels, who were Summary and Special Court Martial Convening Authorities and presided over misdemeanor trials, shared similar sentiments:

- **Colonel William Hagan, former Judge on Military Court of Appeals:** "Steve's overall character is, in my opinion, so uncommonly representative of innate honesty, integrity, selfless service, and all- around goodness." Ex. OO (May 23, 2023 W. Hagan Ltr.).

- **Colonel Lawrence Macintyre:** "I have known Steve Buyer for 35 years . . . Steve has clearly served his country with distinction in both military and legislative capacities. He has done lasting good for millions of veterans and their families, and I pray this will be taken into account as the court weighs a sentence." Ex. C (Apr. 4, 2023 L. MacIntyre Ltr.).

- **Colonel David Murphy:** "I am aware of the serious crime of which Steve stands convicted . . .  Based on the number of years I have known Steve, and the military service we shared, I must say the conduct which led to his conviction is totally out of character . . . I trust him implicitly. Whatever resulted in his prosecution is an outlier in a life that has been devoted to serving his country." Ex. R (May 4, 2023 D. Murphy Ltr.).

- **Colonel John Buyer:** "Steve profoundly embraces honor and is a principled decision maker who is painfully honest." Ex. TT (May 25, 2023 J. Buyer Ltr.).

- **Testimony of Justice Steven David, Indiana Supreme Court, and Retired Colonel:** He has known Mr. Buyer to be very honest, law-abiding, and a man of high integrity with a willingness to serve others. Tr. at 1183-1185 (S. David).

10

- **Commander Michael Brinck:** "I found Steve to be a man of honor, true to his word and always supportive of the mission of the Veterans Affairs Committee . . . Despite his conviction, I hope his lifetime history of service both in uniform – including in the Iraq combat theater – and to his community as a Congressman" will be considered. Ex. K (Apr. 20, 2023 M. Brinck Ltr.).

In addition, many of Mr. Buyer's friends share examples of his private acts of kindness and empathy which, absent these proceedings, would have continued to go unnoticed except by the people that were impacted. *See e.g.,* Ex. I (Apr. 18, 2023 J. Oyler Ltr.) (recalling the time Mr. Buyer went to the Combat Support Hospital to see Command Sergeant Major Joe Oyler, who had been seriously injured during the first Gulf War: "As I lay in pain in my hospital bed, my first visitor was Captain Steve Buyer. I was so surprised. He really cheered me up and even got me laughing a bit. I will never forget that moment. To this day, I have a framed photo of his visit with me."); Ex. DD (April 4, 2023 T. Regelmann Ltr.) (Mr. Buyer helped her husband, also a veteran, apply for medical assistance programs when he got sick and even stepped up to serve as military Chaplin to officiate his service when he passed); Ex. RR (May 28, 2023 T. DiNardo Ltr.) ("Steve has a quiet and often unnoticed history of selfless acts of benevolence for veteran causes and restorative mental needs and many others too numerous to mention."). Mr. Buyer's sister recalls several instances where Mr. Buyer helped save a life. *See* Ex. M (Apr. 23, 2023 D. Buyer Ltr.) (recounting that Mr. Buyer (1) performed CPR on an 80-year-old who collapsed while watching a baseball game, (2) found a man who was runover by a semi-trailer and kept him stable and calm until the paramedics arrived, and (3) intervened to prevent a young Marine from committing suicide); *see also* Ex. RR (May 28, 2023 T. DiNardo Ltr.) (on more than one occasion, Mr. Buyer acted "as a personal friend and advocate" for veterans who were struggling both physically and emotionally as the result of their service). The attached letters of support provide beyond

peradventure the type of life Mr. Buyer has led in terms of service to others, in ways both large and small. Mr. Buyer has also submitted a letter to the Court. *See* Ex. VV (June 12, 2023 S. Buyer Ltr.).

## SENTENCING ANALYSIS

18 U.S.C. §3553(a) provides that the Court must "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing. *See United States v. Stewart*, 590 F.3d 93, n.30 (2d Cir. 2009). In *Rita v. United States*, 551 U.S. 338 (2007), the Court summarized the Section 3553(a) factors as follows: the "(1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) just punishment (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution." *Id.* At 347-48. These factors are the "bedrock of all federal sentencing." *United States v. Gupta*, 904 F. Supp. 2d 349, 353 (S.D.N.Y. 20 12), aff'd, 747 F.3d 111 (2d Cir. 2014).

Although the Court is obligated to give fair consideration to the United States Sentencing Guidelines (the "Guidelines") before imposing the sentence, "the Guidelines are guidelines—that is, they are truly advisory" and "a district court may not presume that a Guidelines sentence is reasonable." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*). Accordingly, the district court has "very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *Id.* At 188. In the end, the Court "must make an individualized assessment of the sentence warranted by Section 3553(a) based on the facts presented." *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008) (internal quotations omitted).

## I.      The Guidelines Calculation

As reflected in the PSR, based upon a total offense level of 20 and a criminal history category of I, the guideline imprisonment range is 33 months to 41 months. PSR ¶ 102. At the Court's direction, the probation officer took "no position on the matters of departure or variance." *Id.* ¶ 119. The probation officer recommends the minimum guideline sentence of 33 months' imprisonment. *Id.* At 30. The Court should give no greater weight to the Guidelines calculation than any of the other factors. *See United States v. Kimbrough*, 552 U.S. 85, 101 (2007); *see also Simon v. United States*, 361 F. Supp. 2d 35, 40 (S.D.N.Y. 2005). For the reasons outlined below, a non-guidelines sentence should be imposed.

Further, the government's argument for a 2-point obstruction enhancement should be rejected as unsupported by the record. The government first contented in its belated May 22, 2023 correspondence to the probation officer that the November 2, 2019 Signal message from Mr. Buyer to Chris Stansbury (GX 406) "was an attempt by Buyer to get his story straight with Stansbury, so that both could lie to Guidehouse and thereby FINRA, and thwart the insider trading investigation." However, this is an unsubstantiated allegation and the trial record provides no support for this argument. The Guidehouse lawyer who took notes of Mr. Buyer's October 31, 2019 interview testified that she had never seen the Signal message before. Tr. at 711:18-20 (K. Koscuiszka). To support its argument, the government points to the portion of the interview notes that read, "I don't want an implication that this is insider trading," even though this line was excluded from the version of the interview notes admitted at trial (GX 741). Mr. Stansbury was never called as a witness at trial and provided no testimony regarding the Signal message.

In fact, Mr. Buyer provided the only substantive testimony about the Signal message when he explained under oath that, when he sent the message, he assumed Mr. Stansbury had already

been interviewed by Guidehouse based on what Mr. Copher had told him. Tr. at 1512:18-25 (S. Buyer). Mr. Copher testified that Mr. Stansbury told him in advance that he was going to be interviewed, and he relayed this to Mr. Buyer. Tr. at 187:6-17 (M. Copher). This is supported by the Guidehouse lawyer's testimony that they interviewed both Mr. Stansbury and Mr. Buyer on October 31 (Tr. at 670:16-671:17 (K. Koscuiszka)), two days *before* Mr. Buyer sent the message. He wanted to see Mr. Stansbury, who he knew was "very upset," to explain that no one at Guidehouse had done anything wrong, he did all trading on his own, and he had speculated about Huron and Navigant. Tr. at 1512:2-1513:16 (S. Buyer). Buyer's testimony on this point was not impeached by any witness, document, or upon cross examination. The government's jaded opinion of the purpose for which Mr. Buyer sent the Signal message is not sufficient to support an obstruction enhancement.

The government next alleges that Mr. Buyer lied in his trial testimony that he did not learn of the T-Mobile/Sprint merger until an April 10, 2019 meeting with Tony Russo. Tr. at 1414:15-21 (S. Buyer). The government relies solely on the uncorroborated self-serving testimony of Mr. Russo, who has no specific memory of when, where, or how he first told Mr. Buyer about the renewed merger talks. Tr. at 261:4-6 (T. Russo). Rather, the government simply argues that because the jury convicted Mr. Buyer of Counts One and Two, it necessarily follows that it found Mr. Buyer's statement about when he learned of the merger to be false. However, without specific jury findings, we do not know what it found as to this particular allegation. "[A]n obstruction enhancement is not warranted merely because the jury did not believe the defendant's testimony; the enhancement should only be applied if the court determines that the defendant committed perjury." *United States v. Johnson*, 612 F.3d 889, 895 (7th Cir. 2010).

14

The facts simply do not support a showing that Mr. Buyer willfully obstructed justice pursuant to U.S.S.G. § 3C1.1. *See United States v. Thompson,* 808 F.3d 190, 194 (2d Cir. 2015) ("If the obstruction-of-justice enhancement is based on perjurious testimony, courts must apply the federal criminal perjury statute, 18 U.S.C. § 1621."); *United States v. Rosario,* 988 F.3d 630, 633 (2d Cir. 2021) ("[T]he defendant (1) willfully and (2) materially (3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter") (quoting *Thompson,* 808 F.3d at 194-95). To apply this enhancement, a district court must find that the defendant gave false testimony with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory. *United States v. Kerley*, 544 F.3d 172 (2d Cir. 2008). "Willfully" implies "a specific intent to obstruct justice, i.e., that the defendant consciously acted with the purpose of obstructing justice." *United States v. Woodard*, 239 F.3d 159, 162 (2d Cir. 2001) (internal quotations omitted). Such facts do not exist here.

**II. Relevant Section 3553(a) Factors**

The Guidelines range is only one component for the Court's consideration at sentencing. The Court must also consider, among other things, the defendant's "history and characteristics" and "the need for a sentence to reflect the basic aims of sentencing," such as just punishment, deterrence, and rehabilitation. 18 U.S.C. § 3553(a)(1); *see also Rita v. United States*, 551 U.S. at 347-48.

A. Mr. Buyer's History and Characteristics

Mr. Buyer's distinguished military service and related Congressional public service and consulting work devoted primarily towards military members and veterans over a 31-year span is the exact type of unique circumstances contemplated by the Guidelines for downward departures. This is demonstrated by evidence from testimony at trials and the many letters reflecting knowledge of Steve's deep devotion to military service and veterans. The Court should therefore

15

apply a substantial downward departure under the general language of U.S.S.G. § 5K2.0(a)(2) and the specific authority of § 5H1.11. As a specific offender characteristic, "[m]ilitary service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.11. Military, civic, charitable, or public service, employment-related contributions, and similar prior good works are not ordinarily relevant in in determining whether a sentence should be outside the applicable guideline range, but can be considered for a downward departure if they are present *to an exceptional degree. Id*; *United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (district court did not err in granting six-level downward departure; "the record plainly demonstrates the 'exceptional degree' of Canova's public service and good works," where the defendant had served in the Marine Corps for six years and as a volunteer fire fighter for seven years, and on three occasions, administered emergency CPR as a Good Samaritan).

Even if the Court finds that a downward departure is not warranted on these grounds, Mr. Buyer's history and characteristics overwhelmingly weigh in favor of a downward variance. In *United States v. Huntley*, the court applied a downward variance for a white-collar defendant who was a former state senator, noting that "[a]side from the instant offense and related conduct, defendant has exhibited a lifetime of commendable volunteering and public service." 961 F. Supp. 2d 409, 414 (E.D.N.Y. 2013); *see also United States v. Torres*, 464 F. Supp. 3d 651, 662 (S.D.N.Y 2020) (considering at sentencing the defendants' "substantial contributions to their communities, and [showing] a commitment to public service if they [were] released").

Undoubtedly, society would benefit more from Mr. Buyer remaining in the community in order to help others. *See* PSR ¶¶ 68, 71; Ex. U (Apr. 27, 2023 J. Cain Ltr.) ("imprisonment would

hamper his good works in helping others"). To that end, Mr. Buyer proposes a non-custodial sentence of home confinement and as many hours of community service with the American Legion and Union Chapel Cemetery as the Court sees fit. Both organizations have written letters to the Court detailing their pressing need for Mr. Buyer's volunteer services. Ex. V (May 31, 2023 American Legion, National Adjutant Ltr.); Ex. W (June 4, 2023 Union Chapel Cemetery Association Board Ltr.).

The American Legion offers the following proposal:

> Should the Court see fit to impose a probationary sentence and order Mr. Buyer to work in meaningful community public service, The Legion would certainly appreciate being considered as a beneficiary of that service . . . We are hiring a new Legislative Director. We propose to utilize Mr. Buyer's services to train our new Legislative director. Mr. Buyer would work at The Legion's office in Indianapolis for as many hours as the Court may deem appropriate.

> Ex. V (May 31, 2023 American Legion, National Adjutant Ltr.).

The Union Chapel Cemetery Association Board also proposes the following:

> Upon any assignment of community service to Steve Buyer, we request that Union Chapel Cemetery become a beneficiary of such service. The Cemetery was designated an Indiana Historic Cemetery by the Indiana Department of Natural Resources. It has grave sites for veterans. We could use his expertise and service to create a veterans registry for our historical cemetery . . . Mr. Buyer would be assigned an initiative to create a Veterans Burial Ground Registry. He will need to collaborate with the Indiana Archive and Records Administration. His efforts will help us as we also support the state of Indiana's effort to document and survey the burials at our Cemetery. We could also use his efforts for grave restoration to assist in identifying, documenting, aligning the grave markers, and restoring long-forgotten final resting places of our veterans.

> Ex. W (June 4, 2023 Union Chapel Cemetery Association Board Ltr.).

B. The Nature and Circumstances of the Offense

We acknowledge that these are serious offenses. However, Mr. Buyer's history and characteristics are inconsistent with the nature and circumstances of the offense conduct. Trading

17

on material nonpublic information and violating the confidences of his company clients would be completely at odds with Mr. Buyer's lifelong character of honesty, integrity, law abidingness, and his history of public service and empathy for others without seeking any credit. *Supra* at 8-10. In *United States v. Gupta*, the defendant's personal history and characteristics starkly contrast[ed] with the nature and circumstances of his crimes. 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012) (insider trading case where the court imposed a non-guideline sentence of 24 months where the total offense level was 28, the criminal history category was I, and the Guidelines range was 78 to 97 months). There, the Court considered that the defendant had "selflessly devoted a huge amount of time and effort to a very wide variety of socially beneficial activities," and that such activities were "but illustrations of Mr. Gupta's big heart and helping hand, which he extended without fanfare or self-promotion, to all with whom he came in contact." *Id*. at 353. So too here for Mr. Buyer.

       C. Incarceration is Unnecessary to Achieve the Aims of Sentencing

       Mr. Buyer has already suffered significant collateral consequences, and therefore, incarceration is unnecessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence. As described in more detail below, "Steve and his family have suffered significantly merely by his conviction. His reputation, his inability to practice law, his loss of his business, his financial losses have all greatly impacted and will continue to impact both Steve and those most close to him." Ex. T (Apr. 23, 2023 D. Kaucheck Ltr.). "[Steve] and his family are emotionally and financially devastated by this conviction." Ex. X (Apr. 17, 2023 G. Wells Ltr.).

       A defendant's loss of reputation, assets, and income, combined with the inability to engage in similar or related activities, constitutes both specific and general deterrence. *United States v. Gaind*, 829 F. Supp. 669 (S.D.N.Y. 1993); *see also United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (specific deterrence was achieved where defendant's reputation was ruined

by his conviction for a white-collar crime, and he was extremely unlikely to involve himself in future misconduct); *United States v. Johnson*, No. 16-CR-457-1(NGG), 2018 U.S. Dist. LEXIS 71257, at *18 (E.D.N.Y. Apr. 26, 2018) (finding "the expense and emotional harm that have resulted from this prosecution, and the disgrace of having been convicted of a felony" as sufficient for general deterrence for white-collar crimes); *United States v. Gupta*, 904 F. Supp. 2d at 355 (concluding that a reputational blow makes it unlikely a particular defendant would "repeat his transgressions and no further punishment is needed to achieve this result.").

### 1. *Financial and Professional Consequences*

Upon his indictment, Mr. Buyer lost all of his consulting clients and, seemingly overnight, his two businesses crumbled. From 2018 to 2021, the businesses brought in an average yearly gross income of around $2.2M, which came to a crashing halt in 2022 and have generated no income ever since. His conviction ensures that he will never again be able to consult for and advise Fortune 500 companies, or any companies for that matter, where he could have access to material nonpublic information. The cost of litigation has also been substantial, causing Mr. Buyer and his wife to sell most of their assets, including their home, condo, and two cars. Four financial institutions have closed or frozen his bank accounts, including his investment accounts. Two credit card companies have similarly closed his cards and accounts. His criminal conviction will also cause him to lose his Virginia and Indiana bar licenses.

### 2. *Family and Reputational Harm*

Mr. Buyer's indictment and conviction have irreparably damaged his reputation, tarnished his achievements and lifetime of service, and continue to bring shame and humiliation to him and his family. His family has also been negatively impacted, including causing strain on his relationship with his son Ryan, a financial advisor at Charles Schwab. Since the charged conduct

involved Mr. Buyer's trading activity in accounts he held at Charles Schwab, including one with

Ryan, Ryan was interviewed by his employer and the prosecutors, and has incurred significant

legal fees as a result. Because of the loss of income, Mr. Buyer's wife Joni will have to enter the

workforce at age 65, and Mr. Buyer fears for the impact that stress will have on her incurable

disease. Mr. Buyer feels deep "remorse for the heartache he has caused his family." Ex. Y (April

29, 2023 R. Guy Ltr.).

### D. A Non-Custodial Sentence Will Not Cause Unwarranted Sentencing Disparities

It is simply not true that applying a non-custodial sentence here would produce

"unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The U.S. Sentencing Commission's own data

shows that, from 2015 through 2021, more than a third (34.2%) of all sentences under Guideline

Section 2B1.1 (applicable to violations of 18 U.S.C. § 1348) and Section 2B1.4 (insider trading)

where the defendant had a criminal history of category I were non-custodial sentences. *See*

Interactive Data Analyzer, United States Sentencing Commission, *https://ida.ussc.gov/analytics*

(last visited June 7, 2023). More than 70% of the sentences did not exceed 24 months in length.

*Id*. If anything, imposing a Guidelines sentence here, even without the military service component,

would produce *more* rather than less disparity.

### E. Restitution

In a show of good faith, Mr. Buyer has put the funds for a potential restitution award in a

separate, interest-bearing account and would be willing to provide documentary support. He

otherwise requests that any payment of restitution be reserved until after the completion of the

appellate process.

## <u>CONCLUSION</u>

For the forementioned and other reasons that will be raised during the sentencing hearing on July 11, 2023. We ask that Mr. Buyer be sentenced to home confinement and appropriate community service.

Dated:      New York, New York
             June 14, 2023

/s/ *Henry W. Asbill*
Henry W. Asbill
ORRICK, HERRINGTON & SUTCLIFFE LLP
2001 M Street NW
Washington, DC 20036
Tel: (202) 349-8007
hasbill@orrick.com

Olivia A. Rauh
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Tel: (212) 600-2343
orauh@orrick.com