UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
UNITED STATES OF AMERICA,  :
                                                :      22 Cr. 397 (RMB)
             Government,  :
                                                  :
               -v-                       :      **DECISION & ORDER**
                                                  :
STEPHEN BUYER,  :
                                Defendant.  :
---------------------------------------------------------------x

## I.    Introduction

Having reviewed the record herein, the Court respectfully denies Defendant Stephen Buyer's motion, dated September 22, 2023, for bail pending appeal. Defendant raises no "substantial question," nor any "close question" warranting deferral of Buyer's scheduled surrender date of November 28, 2023. Defendant also fails to show that no "rational trier of fact could have found the essential elements of [Buyer's] crime[s] beyond a reasonable doubt." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011).

The Defendant, who testified on his own behalf, was found guilty by the jury of all four counts of securities fraud, *i.e.*, misusing and profiting from material non-public information ("MNPI") when he purchased Sprint stock in 2018 and Navigant stock one year later. The counts included (1) securities fraud in connection with the purchase of Sprint stock, in violation of 15 U.S.C. §§ 78j(b) and 78ff; (2) securities fraud in connection with the purchase of Sprint stock, in violation of 18 U.S.C. § 1348; (3) securities fraud in connection with the purchase of Navigant stock, in violation of 15 U.S.C. §§ 78j(b) and 78ff; and (4) securities fraud in connection with the purchase of Navigant stock, in violation of 18 U.S.C. § 1348.[1]

Defendant's trial lasted 9 days; jury deliberations took less than four hours.

---

[1] While Defendant Buyer had every right to testify, he was also obligated to tell the truth. The Court, at sentencing, determined by a preponderance of the evidence that Defendant Buyer lied when he testified. (*See* Sent'g Tr., dated Sept. 19, 2023, at 36–38.) As a result, Buyer received a two-level sentence enhancement for obstruction of justice. (*See id.*)

## II.  Legal Standard

Federal law "disfavors" release on bail after a defendant has been convicted by a jury and sentenced to incarceration.  *United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).  There is "no general expectation of post-verdict liberty."  *Id*.  One Circuit Court has determined that: "Once a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even to permit it in the absence of exceptional circumstances."  *United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985).

The Bail Reform Act provides that the court "shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal" be detained pending appeal unless the court finds that the person is not likely to flee or pose a danger to the safety of any other person or the community if released **and** that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in reversal or an order for a new trial. (18 U.S.C. § 3143(b).)

To prevail on a motion for bail pending appeal, the defendant must raise a "substantial question" and must show "that the appeal is not for purpose of delay."  *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985).[2]  A substantial question must be "so integral to the merits of the conviction on which [the] defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction

---

[2] The Court here reserves judgment as to whether Defendant Buyer's motion is "designed to delay." On several occasions Defendant sought to put off the S.D.N.Y. trial, complaining that he was unable to obtain a fair trial in New York City, principally because he is a former Republican U.S. Congressman from Indiana.  (*See, e.g.*, Def. Mot. in Limine, dated Oct. 21, 2022 at 4 n.3; *see also* Def. Supp. Mot. in Limine dated Feb. 12, 2023 at 6–7 ("The defendant simply cannot get a fair trial if he has to face a New York jury . . . .").)

In rejecting Defendant's applications, the Court pointed out that S.D.N.Y. jurors are uniformly conscientious, fair, and unbiased. (*See* Hr'g Tr., dated Feb. 21, 2023, at 7.)  The jury in this case never exhibited any bias whatsoever toward Defendant.  Rather, after due deliberations, the jury determined that Defendant Buyer was guilty of each of the counts in the Indictment.

or a new trial.'" *Id.* at 125 (quoting *Miller*, 753 F.2d at 23). And, the defendant must rebut the "presumption in favor of detention." *Abuhamra*, 389 F.3d at 319.

Where, as here, the defendant seeks to challenge the sufficiency of the evidence on appeal, he "bears a heavy burden." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011). "The conviction must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Persico*, 645 F.3d at 105. "[T]he reviewing court is required to draw all permissible inferences in favor of the government [appellee] and to resolve all issues of credibility in favor of the jury verdict." *Kozeny*, 667 F.3d at 139.

### III. Analysis

#### FBI Forensic Examiner Jessica Volchko's Testimony Was Admissible

"The Federal Rules of Evidence allow the admission of fact testimony so long as the witness has personal knowledge." *United States v. Marsh*, 568 F. App'x 15, 16–17 (2d Cir. 2014) (citing Fed R. Evid. 602). Such testimony is admissible when presented by a witness who has "specialized knowledge," as in the case of Government witness Jessica Volchko.[3] Testimony is admissible where it is: (1) relevant under Fed. Rule of Evid. 401; (2) within the personal knowledge of the witness under Fed. Rule of Evid. 602; and (3) helpful under Fed. Rule of Evid. 403. *See* 29 Charles A. Wright & Victor J. Gold, Federal Practice and Procedure: Evidence § 6253, at 117 (1997). "A witness's specialized knowledge, or the fact that [s]he was chosen to carry out an investigation because of this knowledge, does not render h[er] testimony 'expert' as long as it was based on h[er] investigation and reflected h[er] investigatory findings and conclusions, and was not rooted exclusively in h[er] expertise[.]" *United States v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007).

Buyer contends that FBI Digital Forensics Examiner Jessica Volchko should not have been allowed to testify because "Ms. Volchko was not the analyst who performed the Cellebrite [Report] analysis in

---

[3] Ms. Volchko is an FBI Digital Forensics Examiner. The Government had intended to call (and had produced 3500 material) FBI Forensic Examiner Shane Duda, who left the FBI before trial. (*See* Gov't Resp. at 5.)

3

question," and should not have been permitted to "introduce and interpret expert forensic analysis" contained in the Cellebrite Report. (Def. Mot., dated Sept. 22, 2023, at 3.) The Government persuasively responds that "Buyer's challenge to Ms. Volchko's testimony and the admission of the [Cellebrite Report] is meritless and does not raise a substantial question of law or fact." (Gov't Resp., dated Oct. 6, 2023, at 2.) Among other things, Ms. Volchko has properly given similar testimony in several other S.D.N.Y. cases without being qualified as an expert. *See discussion below; see also United States v. Ray*, No. 20 Cr. 110 (LJL), 2022 WL 817270 (S.D.N.Y. Mar. 16, 2022); *United States v. Avenatti*, No. 19 Cr. 374 (JMF), Trial Tr. 624–31 (S.D.N.Y. Jan. 26, 2022).[4]

The testimony of Ms. Volchko and the Cellebrite Report were admissible for several reasons. First, Ms. Volchko's testimony, including "what Cellebrite is and what's shown in the report" (Trial Tr. at 884:17–18), was lay (not expert) testimony. *See* Rule 16(a)(1)(G); *see also Marsh*, 568 F. App'x at 16–17 (where lay testimony relating to the search of an electronic device was admissible). Law enforcement witnesses—including Ms. Volchko—routinely testify regarding forensic images and electronic searches without being qualified as experts. *See Ray*, 2022 WL 817270, at *1 (where Judge Liman rejected a defense motion to preclude lay witness testimony). As noted, Ms. Volchko's testimony was previously admitted by Judge Furman where it involved similar forensic searches. *See Avenatti*, No. 19 Cr. 374, Trial Tr. 624–31.

---

[4] The following colloquy took place during Buyer's trial. **Defense Counsel**: "So this witness [Ms. Volchko] was a last-minute substitute for a previous witness that the government was going to call. It's somebody who is a certified examiner of computer systems for the FBI. She is going to testify based on specialized expertise . . . . So because she is testifying pursuant to specialized knowledge, it's not lay opinion under 701, so I ask that your Honor preclude this witness from testifying." **Government Counsel**: "[Ms. Volchko] is not going to talk about how devices are extracted or the technical aspects of that. We are going to show her [the Cellebrite Report] which was prepared [by another FBI examiner]. All she's going to say is what [the Report] is and what's shown in the [R]eport. . . . **[T]he Cellebrite report from which certain exhibits will be introduced through Ms. Volchko matches the chain of custody form and matches the phone number that we've agreed by stipulation is Christopher Stansbury's phone number**." **Court**: "I'm going to allow it." (*See* Trial Tr. at 884:14–21, 885:3–24 (emphasis added).)

Second, the Cellebrite Report was authenticated. *See infra* 6 n.5. "The requirement of authentication . . . is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). A document is properly authenticated where "a reasonable juror could find in favor of authenticity." *United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004). Rule 901 "does not erect a particularly high hurdle, and that hurdle may be cleared by circumstantial evidence." *Id.* (citation and quotation omitted). The Government provided an evidentiary basis (authentication) from which the jury could reasonably find that the extractions from Guidehouse Sales Director Christopher Stansbury's cellphone are what they purport to be, namely, a compilation of data extracted from his cell phone. *See United States v. Jean-Claude*, No. 18 Cr. 601 (PGG), 2022 WL 2334509, at *21 (S.D.N.Y. June 27, 2022).[5]

Third, Ms. Volchko's testimony did not violate the Confrontation Clause. *See Washington v. Griffin*, 876 F.3d 395, 404 (2d Cir. 2017) (quotation marks and alteration omitted). In fact, Defendant Buyer's counsel did cross-examine Ms. Volchko at trial regarding the bases for her testimony. (*See, e.g.*, Trial Tr. at 926:22–23 (Defense Counsel: "So you didn't receive the original device, right?" Ms. Volchko: "That's correct."), 927:9–11 (Defense Counsel: "Is it a bit-by-bit copy of the data from the device?" Ms. Volchko: "It was a logical extraction, so it only contained certain types of information."), 988:20–22 (Defense Counsel: "And you went over your testimony with [Government Counsel] Ms. Fletcher, of course?" Ms. Volchko: "Yes.")); *see also Jean-Claude*, 2022 WL 2334509, at *21 (where Judge Gardephe held that cell phone extractions "were properly admitted under Fed. R. Evidence 901 and the Sixth

---

[5] Ms. Volchko testified that the date and IMEI serial number in the Report were identical to the date and IMEI serial number in a corresponding form that was used to document the extraction of Stansbury's phone. (*See* Trial Tr. 670–71, 890.) This form was admitted into evidence by Schulte Roth & Zabel attorney Kelly Koscuiska. (*See* Trial Tr. 670–71.) "[T]he Government showed Ms. Volchko a stipulation confirming that the phone number that appeared on the document marked as Government Exhibit 655 was the phone number used by Christopher Stansbury, thereby providing a basis to conclude that [Government Exhibit] 655 was a Cellebrite report containing certain of the contents of the image . . . of Stansbury's phone created during the course of the investigation." (Gov't Resp. at 5 (citing Trial Tr. 890:6–17).)

Amendment's Confrontation Clause"); and *United States v. Gayle*, No. 16 Cr. 361 (CS) (S.D.N.Y. Sept. 14, 2017) (where Judge Seibel admitted cell phone extractions through testimony of a witness who had not performed the extractions).

### There Was No Constructive Amendment of Indictment

"In the usual context of a conviction after trial, to establish a constructive amendment, a defendant must show that the trial evidence or jury instructions 'so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment.'" *United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014) (quotation omitted). There is no doubt in this case that Defendant was convicted of the crimes set forth in the Indictment. There was no constructive amendment. *See id*.

Buyer argues unpersuasively that the Government "broadened its theory . . . by eliciting testimony [from Anthony Russo, T-Mobile Vice President] that both Buyer's purchase *and sale* of Sprint stock w[ere] 'highly inappropriate' and 'violat[ed] . . . the [T-Mobile] insider trading rules.'" (Def. Mot. 7 (quoting Trial Tr. at 346:20–4).) The Government counters that there was no constructive amendment of the Indictment for several reasons. (*See* Gov't Resp. at 6–7.) For one thing, the evidence at trial showed that each of the four counts set forth in the Indictment—(1) securities fraud in connection with purchase of Sprint stock in violation of 15 U.S.C. §§ 78j(b) and 78ff; (2) securities fraud in connection with purchase of Sprint stock in violation of 18 U.S.C. § 1348; (3) securities fraud in connection with purchase of Navigant stock in violation of 15 U.S.C. §§ 78j(b) and 78ff; and (4) securities fraud in connection with purchase of Navigant stock in violation of 18 U.S.C. § 1348—was proven beyond a reasonable doubt. (*See, e.g.*, Gov't Resp. at 9–10 (citing Trial Tr. at 241, 259, 314–16, 338, 349, 474, 487–521, 732–34; *see also, e.g.*, Gov't Exs. 210, 401, 540, 605, 652, 909.) Anthony Russo's testimony "clearly pertained only to the March and April 2018 [buy] trades." (Gov't Resp. at 6.) Any "evidence of [Buyer's] sale of the shares that he purchased based on MNPI, and the resultant profits, was, of course, directly relevant to charged conduct." (*Id*.) And, any testimony of Buyer's sales of Sprint stock was "necessary to complete the story of the charged crime[s], as

6

well as to explain Buyer's motive and demonstrate that Buyer purchased the stock for the purpose of short-swing profits based on misappropriated information." (*Id*.) The Government elicited testimony about Buyer's August trades only to provide a timeframe and to offer insight as to "what Mr. Russo would have thought if Mr. Buyer had told him about buying Sprint stock in March and April 2018 and selling in August 2018." (*Id*.)

The Court made crystal clear to the jury that "[f]rom start to finish, in every jury address and in the final charging instructions, the jury was told the same thing: that Buyer was on trial for purchasing securities while in possession of material non-public information." (Gov't Resp. at 6; *see also* Trial Tr. at 1706–07 (Court's instruction to the jury: "Counts One and Two of the indictment each charge the defendant with committing securities fraud through insider trading by misappropriating inside information from T-Mobile and using that information to buy . . . Sprint stock, in 2018").) The jury was specifically told that "in connection with the purchase of securities . . . the defendant employed a device, scheme or artifice to defraud" (Trial Tr. 1709:17–24), and that "the scheme to defraud was connected to the purchase of securities." (Trial Tr. 1723:8–12.) The jurors were also provided with a copy of the Indictment. (*See* Trial Tr. at 1699.)

### SDNY Venue Was Clearly Established

In accordance with the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, "[a]ny criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred." 15 U.S.C. § 78aa. There can be no doubt that the Government established by a preponderance of the evidence that venue was proper in the Southern District of New York. *See United States v. Chow*, 993 F.3d 125, 143 (2d Cir. 2021); (*see also* Decision & Order, dated March 14, 2023.)

Venue was clearly established in this case because: (i) the Government showed that Buyer's Sprint and Navigant trades "took place on the New York Stock Exchange;" (ii) that trades were conducted by a Manhattan-based executing broker; and (iii) that trades were settled and cleared in Manhattan at least in part. (Gov't Resp. at 7; *see also* Trial Tr. at 725.) "[A]ll of the defendant's stock trades took place on the

New York Stock Exchange, which is headquartered in Manhattan." (Gov't Resp. at 7 (citing Trial Tr. at 725).) And, where, as here, the defendant is charged with an offense involving the trading of securities on a stock exchange located in the SDNY "venue in that district is appropriate." *Chow*, 993 F.3d at 143; *see also United States v. Geibel*, 369 F.3d 682, 697–98 (2d Cir. 2004) (trades that "utilized the facilities of any New York based securities exchange or brokerage firm" confer venue).

Buyer's Sprint and Navigant trades were conducted by a Manhattan-based executing broker (and processed by a data center in Westchester County). (Gov't Resp. at 7; *see also* Trial Tr. at 854–62.) At the trial, the Government called Matt Levine, an attorney at Virtu Financial, who testified that Virtu Financial, a broker which executed the Sprint and Navigant trades, was headquartered in Manhattan. (*See* Trial Tr. at 854–862.) In addition, Government witness Carl Vallese, counsel at Two Sigma Securities, testified that Two Sigma Securities was the selling broker for Navigant trades and was also based in Manhattan. (Gov't Resp. at 8 (citing Trial Tr. at 843).)

Buyer's Sprint and Navigant trades were "settled" and "cleared" through the Manhattan Data Center of the Depository Trust and Clearing Corporation ("DTCC"). Government witness Robert Servinskas, Director of Data Center Operations at DTCC, "testified that DTCC's data centers in Manhattan and Brooklyn act as a single logical mainframe, and that when data comes into the logical mainframe, it is [stored] in Brooklyn and Manhattan, in a synchronous way." (Gov't Resp. at 8 (citing Trial Tr. at 947).) Servinskas explained that "settling and clearance functions did occur, at least in part, in the Southern District of New York." (Gov't Resp. at 8 (citing Trial Tr. at 947)); *see also United States v. Svoboda*, 347 F.3d 471, 484 n.14 (2d Cir. 2003) (holding that the "execution or settlement of a securities trade within this district" is sufficient to establish venue).

**There Was Overwhelming Evidence at Trial That Buyer Bought Stock Based Upon Material Non-Public Information**

At trial, the Government presented overwhelming evidence of Defendant Buyer's securities fraud and certainly "more than enough evidence" to support the jury's guilty verdict. *United States v. Percoco*, No. 16-CR-776 (VEC), 2019 WL 493962, at *14 (S.D.N.Y. Feb. 8, 2019).

**Sprint Stock**

The Government presented irrefutable evidence that Buyer received MNPI about the T-Mobile/Sprint merger while on a golf trip in Florida with T-Mobile Executive Anthony Russo between March 28 and March 30, 2018—and, in any event, no later than April 3, 2018. The Government clearly established the following: (1) T-Mobile Vice President Anthony Russo learned of the renewed merger by March 27, 2018; (2) after March 27, 2018, merger preparations were moving quickly and T-Mobile's Government Affairs and Legal departments, including Russo, acted with a "sense of urgency;" (3) one of the first items on Russo's "to-do list" was informing his "core group" of consultants about the merger; (4) Defendant Buyer was an integral part of Russo's "core group" of consultants; (5) Buyer and Russo (who were golfing partners) were together in Florida at the Trump National Doral Golf Club from March 28 through March 30, 2018 and they played golf together on March 28 and 30; (6) on March 29, 2018, Russo was actively engaged in merger preparations and "outreach" to his core consultants, while Buyer was busy buying 40,000 shares of Sprint stock across multiple brokerage accounts (a stock he had **never** purchased before); (7) Russo's core group were aware of the merger no later than April 3, 2018; and (8) on April 5, 2018, Buyer bought an additional 60,000 shares of Sprint. (*See* Trial Tr. at 241, 253, 259, 314, 474, 732-4; *see also* Gov't Resp. at 9.)

T-Mobile Vice President Anthony Russo confirmed at trial that he exchanged a number of telephone calls and emails about the merger while on the Doral golfing trip. (*See* Trial Tr. 262; *see also* Trial Tr. 264–65, 278–346.) Gov't Ex. 905 is a photograph Buyer took of Russo's daughter at the clubhouse at the Doral on the evening of March 28, 2018, when Buyer joined Russo's family for dinner. Very soon after

9

Russo had put the Sprint merger outreach on his "to-do" list (*i.e.*, under the code heading of "Project Lakes"), Buyer, on March 29, 2018, began aggressively to purchase significant amounts of Sprint stock. (*See* Trial Tr. 259, 732.)

Russo testified that he does not have "a specific memory of telling Steve Buyer that the [merger] talks were back on." (Trial Tr. at 362:16–18.) He did recall that his core group of consultants would have all been aware of the merger by April 3, 2018. (*See* Trial Tr. at 474:13-14.) The record shows that Buyer purchased an additional 60,000 Sprint shares on April 5, 2018, which was two days after the date Russo testified that Buyer, a consultant in Russo's "core group," would have been aware of the merger. (*See* Trial Tr. at 314:1-2 ("**Government**: Now, what did you understand by Mr. Miller's email, is Manus back and fully engaged? **Tony Russo**: That he would be under the tent and engaged with the group working on the merger. **Government**: And what did you respond on April 3rd, 2018? **Tony Russo**: Yes, our core group is aware."); 474:13-14 (**Defense Counsel on cross examination**: "The [April 3rd] email doesn't say Steve Buyer was read in, does it? **Tony Russo**: When it says our core group is, **he's [Buyer] in the core group.**" (emphasis added)).)

There is little doubt that a rational jury would have concluded that Buyer traded in Sprint stock based upon MNPI. (*See* Gov't Resp. at 9.)

**Navigant Stock**

The Government also presented compelling testimony and documentary evidence demonstrating that on June 12, 2019 "Buyer received MNPI regarding Guidehouse's contemplated acquisition of Navigant." (Gov't Resp. at 10; *see also* Gov't Exs. 401, 605.) **"Beginning the following morning,"** *i.e.*, **on June 13, 2019, and for the next several weeks, "Buyer purchased more than $1 million worth of shares in Navigant, a stock he had never purchased before."** (Gov't Resp. at 10 (citing Gov't Ex 540, 652, 909.) The evidence at trial included a series of telephone calls and text message exchanges between and among Alicia Harkness, a Partner at Guidehouse, and Guidehouse Sales Director Christopher Stansbury, as well as Defendant Buyer beginning on June 12, 2019. (*Id.*) Alicia Harkness testified that she

called Stansbury on June 12, 2019 at 5:40 pm regarding the merger involving Guidehouse. (*See* Trial Tr. at 537.) Harkness sought "to get him to give [her] an answer really fast" regarding a report that was needed, presumably for merger discussions. (Trial Tr. at 517–18.) Shortly after the June 12, 2019 call, Ms. Harkness sent Stansbury an email that referenced a proposed "combination" with "synergies" in the revenue cycle management ("RCM") space, thus alerting Stansbury to an impending merger between Guidehouse and Navigant. (Gov't Ex 210; *see also* Trial Tr. 517–21, 537, and 533 (Ms. Harkness also testified that "combination" meant "combination of two companies").)

Government Exhibit 605 shows that seventeen minutes after Stansbury received the June 12, 2023 "combination" email from Harkness, Stansbury called Defendant Buyer. (*See* Gov't Ex 605.) And, "[a]fter the call ended, Stansbury and Buyer exchanged additional text messages that night, and had another phone call." (Gov't Resp. at 10 (citing Gov't Ex 401, 605).) Defendant Buyer admitted that he had "some phone calls," as well as a series of text message exchanges with Stansbury on June 12, 2019. (*See* Trial Tr. at 1459.) As the Government contended during summation, the exchange between Stansbury and Buyer occurred "right after Mr. Stansbury got inside information from Alicia Harkness." (Trial Tr. at 1596.)

The Government presented evidence that, later that night on June 12, 2023, "Buyer logged in to his brokerage account at [Charles] Schwab and searched 'NCI,' the ticker for Navigant." (Gov't Resp. at 10 (citing Gov't Ex 540, 909).) The evidence at trial showed that Buyer "spent over $600,000 . . . in Navigant" stock on June 13, 2019 alone. (Trial Tr. at 1618.)

The Government also presented devastating evidence of an attempted cover-up. In responding to a FINRA inquiry about Navigant stock trading, Guidehouse learned that Defendant Buyer had bought Navigant stock before the public merger announcement. (*See* Trial Tr. 25:14–16; *see also* Trial Tr. 666–672.) And, on October 31, 2019, Guidehouse interviewed Buyer regarding Buyer's Navigant purchases. (*See* Trial Tr. 666–671.) At trial, Buyer admitted that less than 48 hours after his interview with Guidehouse counsel, he sent Stansbury the following message: "I need to see you. Please, I will catch the next flight. I was interviewed and told them I bought . . . ." (Gov't Ex 406; *see also* Trial Tr. 1511–12.) The Government

11

also told the jury that, in an apparent effort to avoid detection, Buyer sent this desperate message to Stansbury via a "disappearing message" program called "Signal," which was intended to erase it within five minutes after it was sent. (*See* Trial Tr. 1623–24.)

In sum, the Government presented overwhelming evidence "that the defendant received material nonpublic information." (*Id*.) Buyer "possessed this information when he bought [Sprint and] Navigant shares." (*Id.* (citing *United States v. McDermott*, 245 F.3d 133, 138-39 (2d Cir. 2001) (where the court concluded that evidence of phone calls temporally connected to trading conduct established insider trading. "Circumstantial evidence is a legitimate form of evidence in this Circuit, and in fact-intensive cases such as this, requiring careful examination of trading records and a myriad of public information, the jury is the appropriate body to determine a defendant's guilt or innocence.")).)

The Defense, by contrast, has not met its burden. It raised no "substantial question of law or fact likely to result in reversal or an order for a new trial." (18 U.S.C. § 3143(b).) "A rational trier of fact could conclude based [among other things] on the timing and content of Government Exhibit 210, the timing of the Stansbury/Buyer calls," the timing and frantic tone of Buyer's disappearing "Signal" message to Stansbury, and the timing of Buyer's Navigant trades, that Buyer "learned about Guidehouse's contemplated combination from his conversation with Stansbury," (Gov't Resp. at 11), and then he purchased the Navigant stock.

### IV.  Conclusion & Order

For the reasons stated herein, Buyer's Motion [#171] is denied.

Dated: New York, New York  
October 16, 2023

*[signature: Richard M. Berman]*

**RICHARD M. BERMAN, U.S.D.J.**